830 F.2d 1532
 23 Fed. R. Evid. Serv. 1263
 UNITED STATES of America, Plaintiff-Appellee,
v.
Raimundo CRESPO de LLANO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
George Antonio ROJAS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Justina GARCIA DOMINGUEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Santos Amable DOMINGUEZ-PERAZA, Defendant-Appellant.
 Nos. 86-1361, 86-1362, 86-1372 and 86-1373.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 15, 1987.
Decided Oct. 26, 1987.
 
 John S. Leonardo, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.
 Bertram Polis, Tucson, Ariz., for defendants-appellants Dominguez and Dominguez-Peraza.
 Scott W. Schlievert, Tucson, Ariz., for defendant-appellant Rojas.
 Stephen G. Ralls, South Tucson, Ariz., for defendant-appellant Crespo de Llano.
 Appeal from the United States District Court for the District of Arizona (Tucson).
 Before CHOY, ALARCON and O'SCANNLAIN, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 Raimundo Crespo de Llano (Crespo), George Antonio Rojas (Rojas), Justina Garcia Dominguez (Dominguez), and Santos Dominguez-Peraza (Dominguez-Peraza) appeal their judgment of conviction after a jury trial. Crespo, Rojas, and Dominguez-Peraza were found guilty of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. Secs. 841(a)(1), 841(b)(1)(A)(ii), and 846; and possession with intent to distribute one kilogram or more of cocaine in violation of 21 U.S.C. Secs. 841(a)(1) and 841(b)(1)(A)(ii). Rojas was also found guilty of assault on a federal officer in violation of 18 U.S.C. Secs. 111 and 1114. Dominguez was convicted for possession with intent to distribute in violation of 21 U.S.C. Secs. 841(a)(1) and 841(b)(1)(A)(ii). We affirm.
 
 FACTS
 
 2
 On April 22, 1986, DEA Agent Anthony Coulson, acting in an undercover capacity, met with Rojas in a park near his residence to discuss the purchase of cocaine. Coulson stated he was interested in buying kilogram quantities of cocaine. Rojas stated he could deliver that amount. Coulson then drove Rojas to Valencia Garden Apartments. When they arrived Rojas pointed to a parked 1974 Mercedes with Nevada license plates and stated: "That's their car. They have just gotten back from Las Vegas. They brought the kilos in that vehicle."
 
 
 3
 Apartment 180 was rented to Claude Robinson. Rojas conducted Coulson to Apartment 180. Rojas introduced Coulson to Crespo and Robinson. Rojas spoke to Crespo in Spanish. Coulson does not speak Spanish. Rojas then told Coulson: "I've told him I've seen your money, that you're trusted--go ahead and do whatever you have to do." After further conversation with Crespo in Spanish, Rojas then explained to Coulson that Crespo wanted to sell one kilo of cocaine before dealing in larger amounts. Coulson responded that he agreed. Crespo nodded indicating his assent.
 
 
 4
 Claude Robinson told Coulson that the people in the apartment used it as a safe house and as a place to sleep. They also used it as a place to conduct cocaine transactions.
 
 
 5
 Crespo handed a small block of powder to Coulson and asked him to taste it. Coulson refused to taste it and instead performed a chemical test. The test showed that the block of powder contained cocaine. During the testing, Dominguez-Peraza entered the kitchen from a bedroom.
 
 
 6
 After the test, Coulson told Rojas that he would purchase a kilo of cocaine. Crespo spoke to Rojas in Spanish. Rojas then told Coulson that the kilo was not in the apartment. Coulson stated that he would not buy the sample because it did not come from the kilo located elsewhere. Rojas replied: "Yeah, that's a very good idea. We'll agree to that."
 
 
 7
 Rojas told Coulson that he had brought a buyer to the apartment the previous day who did not have the money when Crespo produced the cocaine. This incident caused Crespo to become angry with Rojas.
 
 
 8
 Coulson asked how much it would cost to purchase a kilo of cocaine. Crespo spoke to Dominguez-Peraza in Spanish. Dominguez-Peraza replied: "Treinta y tres." Crespo told Coulson: "Thirty-three." Rojas stated: "Thirty-three thousand dollars."
 
 
 9
 Coulson told them he could get the money in one hour. After Crespo and Rojas conferred in Spanish, Rojas stated: "Have it in three hours or the deal is off."
 
 
 10
 Coulson then inquired whether the delivery would be made in the Mercedes. Rojas stated that it would be and that he could also purchase the car for an additional $20,000 in cash.
 
 
 11
 As Coulson drove Rojas back to the area near his residence, Rojas stated that they had brought 16 kilos from Las Vegas in the Mercedes the previous weekend. He also informed Coulson that of this amount 10 kilos were now at a ranch in Tucson. He stated further Dominguez-Peraza was a co-owner of the 10 kilos. The other owner of the cocaine was at the ranch. He described the ranch as having a vintage Corvette, a boat, and dogs in the yard.
 
 
 12
 One and one half hour later, Coulson called Rojas at his residence and told him that he could get the money in one hour. Rojas told him that the exchange would occur at his mother's house. DEA agents then set up surveillance in the area near Rojas' mother's home. At about 5:00 p.m., officers who were surveilling the Valencia Garden Apartments, saw a Chevrolet van and the Mercedes leave the apartments at the same time. The cars were driven to 3607 E. 23rd Street. There, both drivers entered the house and left in about five minutes and drove off. The vehicles were observed heading to the area of Rojas' parent's home.
 
 
 13
 Coulson drove to that residence. When he arrived, he was told that Crespo was on the way with the cocaine. After about an hour, Rojas called Robinson's apartment to find out what had delayed Crespo. Rojas then told Coulson that he had left five minutes earlier.
 
 
 14
 While waiting for the delivery of the cocaine, Coulson showed Rojas $29,400 and told him it was $33,000. Rojas asked Coulson to give him $1,000 before the sale. Coulson declined.
 
 
 15
 At approximately 7:00 p.m., Rojas again telephoned the Robinson apartment. After the call, Rojas told Coulson that Robinson, who was a co-owner of the cocaine, would accompany Crespo to make the sale.
 
 
 16
 While waiting, Coulson noticed a white Thunderbird occupied by a male parked near the Rojas residence. Coulson assumed this man was engaged in counter surveillance on behalf of the cocaine dealers. About one minute after the Thunderbird drove off, Crespo drove up in a 1984 Chevrolet van. He was followed by Dominguez-Peraza in the 1974 Mercedes. Crespo parked the van in the driveway. Dominguez-Peraza drove the Mercedes down the street.
 
 
 17
 Crespo spoke to Rojas in Spanish. Rojas told Coulson that the cocaine was in the van but Crespo was going to move the van before making the sale. Crespo drove the van down the street and got out. Rojas told Coulson to get in. He refused. Rojas then said that the cocaine was in the Mercedes.
 
 
 18
 Coulson went to his car and opened the door. Dominguez-Peraza drove the Mercedes next to the passenger side of Coulson's vehicle. As Dominguez-Peraza got out of the Mercedes, Coulson saw a revolver in the waistband of Rojas pants, partially concealed by his shirt.
 
 
 19
 When Rojas and Crespo arrived, Rojas stated: "It's in the trunk." After a conversation in Spanish with Crespo and Dominguez-Peraza, Rojas told Coulson that they would go down the street to complete the transaction.
 
 
 20
 As Coulson entered his car, Rojas got into the passenger side of the car. Coulson believed that he was in danger and flashed his car lights as a signal to the other agents. Coulson showed Rojas his badge and pointed his firearm at him. Rojas grabbed the gun with his left hand and struck Coulson with his right hand.
 
 
 21
 Coulson's gun discharged through the windshield. Coulson got out of the car. Rojas charged at him. Coulson pointed his gun and yelled: "Freeze, police." Rojas continued running and assaulted Coulson with his fists until the other agents arrived to rescue the officer.
 
 
 22
 During this melee, Dominguez-Peraza sped away in the Mercedes with the lights off. A DEA agent followed the Mercedes onto a freeway. After a chase at speeds in excess of 100 miles an hour, the vehicle was stopped by other police units. Crespo and Dominguez-Peraza were removed from the vehicle. The police found a .38 caliber revolver, several bullets, and a cellular mobile car phone and $6,560 in cash.
 
 
 23
 After Rojas' arrest the agents went to 3607 E. 23rd Street. There, they observed a 1950 Corvette and a boat on a trailer. Dominguez was present. She stated she resided there with her husband, Dominguez-Peraza.
 
 
 24
 After determining that no one else was present at the residence, Dominguez was asked to remain outside. No one was permitted to enter until a search warrant was obtained for the house at 12:35 a.m., on April 23, 1986. When the agents entered the house after obtaining the warrant, Dominguez was told: "You know what we're looking for. Could you save us a lot of time and tell us where the dope is?" The agent also testified he told Dominguez: "[W]e were going to search for it, and--in order to keep from having to tear the house completely apart, if she knew where it was to tell me ..." Dominguez replied: "It's in the kitchen." She then told the officers the cocaine was next to the refrigerator "by the garbage." The officers found three kilograms of cocaine in a plastic shopping bag under an empty pizza container on the kitchen floor. The agents also found $30,011 in cash, bank money wrappers, six firearms, and 1,000 rounds of ammunition.
 
 
 25
 After her arrest, Dominguez told the officers that she and her husband had lived at that residence for about nine months. Prior to that time they had lived in Miami. Her husband had owned a restaurant and was looking for a business in Tucson. He did auto body work and sold cars. On the previous weekend, he had gone to Las Vegas to purchase a Mercedes. After his return she became aware that the cocaine was in the house.
 
 
 26
 At the close of the government's case, the district court granted Dominguez's motion for judgment of acquittal on the conspiracy count.
 
 PART ONE
 
 27
 THE JUSTINA DOMINGUEZ AND SANTOS DOMINGUEZ-PERAZA APPEAL
 
 A. Ineffective Assistance of Counsel
 
 28
 Justina Dominguez and Santos Dominguez-Peraza contend that they were denied their sixth amendment right to effective assistance of counsel and to a fair trial as a result of their representation by a single attorney throughout the proceedings before the district court.
 
 
 29
 The sixth amendment guarantees every criminal defendant the right to the assistance of counsel who is unhindered by conflicting interests. Holloway v. Arkansas, 435 U.S. 475, 482, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978); United States v. Wheat, 813 F.2d 1399, 1402 (9th Cir.1987). Once the parties alert the trial judge to the possibility that counsel representing multiple clients in a single criminal proceeding may face such a conflict, the judge has a duty "either to appoint separate counsel or to take adequate steps to ascertain whether the risk [of a conflict of interests is] ... too remote to warrant separate counsel." Holloway, 435 U.S. at 484, 98 S.Ct. at 1178 (footnote omitted).[1] "The Sixth Amendment requires automatic reversal only when a trial court fails to conduct an inquiry after either a timely conflict objection, or if the court 'knows or reasonably should know a particular conflict exists.' " United States v. Burney, 756 F.2d 787, 791 (10th Cir.1985) (citing Holloway, 435 U.S. at 488, 98 S.Ct. at 1180) (quoting Cuyler v. Sullivan, 446 U.S. 335, 347, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980)).
 
 
 30
 In the instant matter, the government requested a pretrial hearing on the conflict issue. The trial court conducted a hearing in which it sought to "ascertain whether the risk was too remote to warrant separate counsel." Holloway, 435 U.S. at 484, 98 S.Ct. at 1178. The court inquired of counsel for the jointly represented defendants whether the joint representation created a risk of conflict. Counsel assured the court that he had discussed at length with his clients the subject of joint representation and the potential for conflict inherent in such an arrangement, that he did not see any conflict, and that both clients had reaffirmed their desire to have counsel represent them jointly. On the basis of counsel's representations, the court concluded that separate representation would not be required.
 
 
 31
 We believe that the trial court's inquiry satisfied the requirements of the sixth amendment as articulated in Holloway. In ascertaining whether the risk of conflict warrants appointment of separate counsel, the court is entitled to rely on the "good faith and good judgment of defense counsel" who represents to the court that no conflict exists. See Cuyler, 446 U.S. at 347, 100 S.Ct. at 1717; See also id. at 346-48, 100 S.Ct. at 1717-18 (where neither defendant nor his lawyers objected to multiple representation, trial court was entitled to assume that they had determined that no conflict existed or that defendant had knowingly accepted the risk of conflict); United States v. Bradshaw, 719 F.2d 907, 915 n. 3 (7th Cir.1983) ("Generally, the district court is entitled to rely on the assertions of counsel" that no conflict exists); Willis v. United States, 614 F.2d 1200, 1206 (9th Cir.1979) ("the trial court 'must be able ... to rely upon counsel's representations that the possibility of such a conflict does or does not exist'.") (quoting Kaplan v. United States, 375 F.2d 895, 897 (9th Cir.), cert. denied, 389 U.S. 839, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967)); United States v. Cox, 580 F.2d 317, 321-22 (8th Cir.1978), cert. denied, 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979) (court was entitled to rely on counsel's assurance that he did not see any possible conflict in his representation of three defendants). Cf. Wheat, 813 F.2d at 1403 (dictum) (trial court should not rely on counsel to ensure that each of his clients has effectively waived objections to risk of conflict in multiple representation).
 
 
 32
 In addition to the inquiry required under the sixth amendment, however, Fed.R.Crim.P. 44(c) requires that the trial court "personally advise each defendant of the right to the effective assistance of counsel, including separate representation." The government concedes that the court's short colloquy with defense counsel concerning the possibility of a conflict of interests failed to satisfy the Rule's requirement that the court "personally advise each defendant." The question we now face is whether the court's failure to comply with Rule 44(c), standing alone, compels reversal of defendants' convictions.
 
 
 33
 We have not previously addressed this question. Those circuits that have considered the matter, however, appear to be unanimous in holding that a trial court's failure to comply with Rule 44(c) does not alone require reversal. See United States v. Romero, 780 F.2d 981, 985 (11th Cir.1986) ("A technical violation of ... [Rule 44(c) ], however, will not lead to reversal in every case. A defendant must demonstrate the existence of an actual conflict of interest before he is entitled to a reversal of his conviction."); United States v. Mooney, 769 F.2d 496, 499 (8th Cir.1985) ("[t]here is general agreement that failure to comply with Rule 44(c), standing alone, does not mandate reversal."); Burney, 756 F.2d at 791 ("Courts that have addressed the issue have held that a trial court's failure to comply with Rule 44(c) does not, of itself, require reversal of a conviction."); Bradshaw, 719 F.2d at 915 ("[a] complete failure to comply with Rule 44(c) does not mandate a reversal if the defendant is unable to demonstrate an actual conflict."). See also Fed.R.Crim.P. 44(c), Advisory Committee's note ("The failure in a particular case to conduct a rule 44(c) inquiry would not, standing alone, necessitate the reversal of a conviction of a jointly represented defendant.").
 
 
 34
 The rationale for these decisions is that Rule 44(c) was designed as a prophylactic measure, compliance with which would reduce the number of appeals by defendants who initially desired joint representation but later claimed that such representation was not in their best interests. See United States v. Benavidez, 664 F.2d 1255, 1258 (5th Cir.), cert. denied, 457 U.S. 1121, 102 S.Ct. 2936, 73 L.Ed.2d 1334 (1982). "But neither the inquiry nor the advice [required by Rule 44(c) ] is itself the goal of the rule; that goal is preventing conflicts." Id. In Benavidez the Fifth Circuit explained the reason that per se reversal is not required as follows: "[I]t would be a distortion of the purpose of Rule 44(c) to hold that failure to comply with the rule is in itself reversible error without requiring any showing that defendant has been denied the Sixth Amendment right that the rule was designed to protect." Id. at 1259.
 
 
 35
 We are persuaded by the rationale employed by the circuits that have addressed this issue. We hold, therefore, that a trial court's failure to advise personally jointly represented defendants in accordance with Rule 44(c), without more, does not mandate reversal of those defendants' convictions. Reversal is warranted only if a defendant is able to demonstrate the denial of a sixth amendment right that the Rule was designed to protect. Defendant must show "that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 348, 100 S.Ct. at 1718 (footnote omitted). Defendant need not demonstrate prejudice in order to obtain relief, id. at 349-50, 100 S.Ct. at 1718-19, United States v. Sutton, 794 F.2d 1415, 1419 (9th Cir.1986), "[b]ut until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Cuyler, 446 U.S. at 350, 100 S.Ct. at 1719.
 
 
 36
 Accordingly, we must determine whether the record in this matter reveals that the Dominguez defendants' attorney was hindered in effectively representing his clients by an actual conflict of interest. Dominguez and Dominguez-Peraza cite the following alleged lapses in counsel's representation to support their contention that counsel labored under an actual conflict: (1) counsel's failure to file a severance motion; (2) counsel's failure to object to the warrantless, nighttime entry into defendants' residence; (3) counsel's failure to present any opening statements, witnesses, evidence, or plausible theories of defense; (4) counsel's failure to object to, or to request a limiting instruction concerning, testimony of the government's agent referring to certain bad acts of other co-defendants; and (5) counsel's alleged decision to advantage Dominguez at sentencing, to the detriment of Dominguez-Peraza. The record does not demonstrate that these alleged errors and omissions created an actual conflict of interest.
 
 
 37
 A motion to sever was unnecessary because the post-arrest statements of Dominguez, admitted into evidence against her as admissions, did not incriminate as to Dominguez-Peraza. Cf. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (where one defendant's confession was incriminating as to second defendant, admission of confession into evidence in defendants' joint trial violated second defendant's constitutional right of cross-examination). Indeed, her statements exculpated Dominguez-Peraza. In her statement, Dominguez denied that her husband ever had sold cocaine and told the agents that he was engaged in legitimate business enterprises. Counsel's decision to permit the introduction of such evidence in a joint trial with Dominguez-Peraza was a reasonable tactical decision because it tended to establish that he was not engaged in illegal activities involving cocaine.
 
 
 38
 Contrary to the defendants' assertion, the issue of the warrantless entry into defendants' residence was explored by counsel at the July 10, 1986 hearing on defendants' motion to suppress. The evidence indicated that Dominguez voluntarily consented to the entry. Moreover, this entry produced no significant evidence. In addition, defendants interests with respect to this issue would appear to be identical, rather than in conflict.
 
 
 39
 Counsel's decision not to make an opening statement does not show a lack of competency or an actual conflict of interest. By waiving opening statement, counsel was in a position to listen to the defense theories of his clients' co-defendants and the government's proof before revealing his theory of defense to the trier of fact. The record shows that counsel did not call witnesses or introduce any other evidence in defense of his clients. The defendants have failed to make a showing from this record that there are witnesses who could have presented a defense.
 
 
 40
 Defendants contend that counsel's failure to pursue a blame-shifting theory of defense is proof that he was laboring under a conflict. The evidence in this matter did not lend itself to this defense tactic. Dominguez-Peraza could not plausibly shift the blame for his criminal conduct to his wife, in view of the evidence of his participation in the negotiations for the sale of cocaine, his presence at the cocaine delivery site, and his attempt to flee on discovering that the buyer was in fact a police officer. Likewise, Dominguez was in no position to shift the responsibility for her behavior to her husband, in view of her admission that she knew there were three kilograms of cocaine in her residence for several days, and her ability to direct the officers to the precise location of the cocaine in the kitchen of the residence. The Dominguez defendants' retained counsel appears to have advanced the best available defenses, given the nature of the evidence available to the prosecution. Counsel explained Dominguez-Peraza's presence during the negotiations for a sale and at the place where the transaction was to be consummated by arguing that Dominguez-Peraza was merely attempting to sell the Mercedes-Benz to the government agent. He defended Dominguez by arguing that there was no evidence that she possessed cocaine with the intent to distribute it. These were logical defense theories in light of the strength of the government's case.
 
 
 41
 At the close of the government's case, the court granted Dominguez's motion for judgment of acquittal on the conspiracy count. The acquittal of Dominguez on the conspiracy count eliminated even the possibility of a conflict of interests between Dominguez and Dominguez-Peraza concerning the admissibility of the statement of a co-conspirator. Accordingly, counsel's subsequent failure to request limiting instructions concerning the testimony of co-conspirators did not result in an actual conflict of interest.
 
 
 42
 These defendants have failed to demonstrate from this record that a conflict of interest caused counsel to present a more favorable argument for leniency for Dominguez. To the contrary, the evidence presented at trial compelled counsel to argue that Dominguez should receive less severe punishment. Separate counsel could not have changed the fact that the case against Dominguez-Peraza was simply much stronger than that against his wife, and his degree of culpability was much greater.
 
 
 43
 In summary, none of these alleged lapses establish that counsel was laboring under an actual conflict of interests. Defendants have failed to show that they were prejudiced by the trial court's error in failing to advise each defendant personally of the right to separate representation as required by Rule 44(c).
 
 B. Fifth Amendment Claim
 
 44
 Dominguez also contends that her fifth amendment right against self-incrimination was violated because her disclosure of the location of the cocaine was involuntary. We find no merit in this contention.
 
 
 45
 We review de novo the district court's determination of the voluntariness of a defendant's statement to law enforcement officers. United States v. Wolf, 813 F.2d 970, 974 (9th Cir.1987).[2] To be voluntary, an inculpatory statement must be " 'the product of a rational intellect and a free will'." United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.1981) (quoting Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960)). The government bears the burden of proving that the defendant's statements were voluntary. Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). The test is whether under the totality of the circumstances, the government obtained the statement by coercion or improper inducement. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963); United States v. Pinion, 800 F.2d 976, 980 (9th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1580, 94 L.Ed.2d 770 (1987).
 
 
 46
 Dominguez argues that her statement was obtained in a manner similar to that held to be impermissible in Tingle. Tingle is clearly distinguishable. In Tingle the defendant was told that if she did not make a statement she would receive the maximum penalties, she would not see her child for a long time, and her failure to cooperate would be communicated to the prosecutor. Tingle, 658 F.2d at 1336.
 
 
 47
 In the instant matter, Dominguez was told that she could not reenter her house until the search warrant was issued. Dominguez voluntarily consented to wait in the back of the police car until the search warrant was obtained. After the search warrant was issued, Dominguez unlocked the door for the officers and voluntarily reentered. The officers asked Dominguez to reveal the location of the cocaine so that they would not have to tear the house apart. Because the officers were in possession of a search warrant, they were authorized to search into all hidden places to find the cocaine. They did not threaten to take any unauthorized action against Dominguez personally if she remained silent as in Tingle. They simply suggested to her that her cooperation would avoid an unnecessary albeit authorized interference with her household.
 
 
 48
 Dominguez also argues that her statement was coerced because she was a 21-year-old housewife, without formal education or experience with the criminal justice system. Dominguez has failed to show that these factors demonstrated coercion. The totality of the circumstances demonstrates that Dominguez's statement was not coerced or improperly induced.
 
 
 49
 C. Legality of the Exclusion of Dominguez From Her Home
 
 
 50
 Dominguez contends that she was illegally "seized or arrested" in violation of the fourth amendment when she was asked to remain outside after her house was secured by the officers until they obtained a search warrant. This argument lacks merit.
 
 
 51
 First, the fact that officers secure a dwelling until they obtain a search warrant, where probable cause exists to conduct a search, in order to prevent the destruction or removal of evidence, is not an unreasonable seizure of the dwelling or its contents. Segura v. United States, 468 U.S. 796, 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984). The DEA agents secured the residence because Dominguez-Peraza had been involved in the negotiations for the sale of the cocaine. DEA agents saw Dominguez-Peraza and Rojas at the residence shortly before the intended cocaine sale. Under Segura, securing of the Dominguez residence was not an unreasonable seizure because probable cause existed that cocaine was present on the premises. Id.
 
 
 52
 Second, a person is not "seized" within the meaning of the fourth amendment unless, in view of all the circumstance surrounding the encounter with law enforcement officers, a reasonable person would have believed that he or she was not free to leave. United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). There is nothing in this record to show that Dominguez was subjected to threats or a show of force. See id. at 558, 100 S.Ct. at 1879 (no seizure after defendant consented to accompany DEA agents to their office and there was no record of threats or show of force). The evidence shows that the DEA agents informed Dominguez that she was not under arrest when they asked her to remain outside her house and that she voluntarily consented to wait in the police car until the warrant was delivered. The district court correctly determined that no fourth amendment violation occurred.
 
 PART TWO
 THE CRESPO APPEAL
 
 53
 A. Admissibility of the Co-Conspirator Statements
 
 
 54
 Crespo argues that Claude Robinson's extrajudicial statements were inadmissible under the co-conspirator exception to the hearsay rule because there was insufficient independent evidence of Crespo's involvement with the conspiracy. We review de novo the question whether there was prima facie evidence showing the existence of a conspiracy to support the introduction of a co-conspirator's statement. United States v. Rosales, 584 F.2d 870, 872 (9th Cir.1978).
 
 
 55
 A statement by a co-conspirator during the course and in furtherance of the conspiracy is not hearsay and is admissible against other members of the conspiracy. Fed.R.Evid. 801(d)(2)(E). Before admitting a statement of a coconspirator into evidence against a defendant, the government must present independent evidence of the existence of the conspiracy and of the defendant's connection to it, and show that the statement was made during and in furtherance of the conspiracy. Bourjaily v. United States, --- U.S. ----, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987); United States v. Layton, 720 F.2d 548, 555 (9th Cir.1983), cert. denied, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). Once a conspiracy is shown, the prosecution need only present slight evidence connecting the defendant to the conspiracy. United States v. Mason, 658 F.2d 1263, 1269 (9th Cir.1981)
 
 
 56
 In United States v. Paris, 812 F.2d 471 (9th Cir.1987), we found that the government had met its burden of demonstrating defendant's connection to an existing conspiracy when it presented evidence that defendant had met with a certain DePalm just before the latter provided a cocaine sample to the government's undercover agent and that defendant arrived with one kilogram of cocaine at the time and place specified by DePalm for the subsequent sale of cocaine. Id. at 476.
 
 
 57
 The evidence connecting Crespo with the existing conspiracy in the matter now before is as strong, if not stronger, than the evidence we found to be sufficient in Paris.
 
 
 58
 Here, the government presented testimony by undercover DEA agent Coulson that Crespo was present in the apartment during the negotiations for the sale of the cocaine. Crespo obtained a sample of cocaine for Coulson to taste and told Coulson the price of the cocaine in English after Dominguez-Peraza stated the price in Spanish. Crespo was also present at the prearranged location for the cocaine transaction. This independent evidence was sufficient to establish the existence of a conspiracy and Crespo's connection to it.
 
 
 59
 Crespo also argues that Robinson's statements were not admissible because they were not made in furtherance of the alleged conspiracy to sell cocaine. We have previously held that statements are in furtherance of the conspiracy if they are made to keep a person abreast of the conspirators' activities, to induce continued participation in the conspiracy, or to allay fears. United States v. Eaglin, 571 F.2d 1069, 1083 (9th Cir.1977), cert. denied, 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978). It was proper for the district court to infer that Robinson's statement that his apartment was used by Crespo and Dominguez-Peraza as a "safe house" to conduct cocaine transactions was made to keep Agent Coulson abreast of the conspirators' activities or to induce him to purchase narcotics. The statement can also be logically construed as intended to allay any fear Coulson might have about the safety of the apartment. The trial court did not err in concluding that Robinson's statements were made in furtherance of the conspiracy objectives and are admissible under Fed.R.Evid. 801(d)(2)(E).
 
 
 60
 There is no merit to Crespo's further contention that the admission of Robinson's co-conspirator statements violated his sixth amendment right to confront the witnesses against him.
 
 
 61
 Co-conspirator statements are admissible without violating a defendant's right of confrontation if the trial court determines the evidence is reliable. Paris, 812 F.2d at 476-77. The reliability of co-conspirator statements is determined by (1) whether the declarations are assertions of past fact; (2) whether the declarant had personal knowledge of the facts he related; (3) whether it was possible the declarant was relying on faulty recollection; and (4) whether the circumstances suggest the declarant misrepresented the defendant's involvement in the crime. Dutton v. Evans, 400 U.S. 74, 88-89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970); Paris, 812 F.2d at 477. Moreover, the court need not independently inquire into the reliability of these statements. Bourjaily, 107 S.Ct. at 2783. Robinson's statement that Crespo and others used the apartment as a "safe-house" to conduct cocaine transactions meets all four requirements. It was an assertion of past fact, he had personal knowledge of the manner in which the premises were used because he rented the apartment, and the statement was not dependent upon Robinson's recollection. Coulson's observation of Crespo's involvement in the negotiations concerning the narcotics transaction demonstrated the trustworthiness of the statement.
 
 
 62
 B. Admissibility of Non-Narcotics Evidence Seized at the Dominguez-Peraza House
 
 
 63
 Crespo contends that evidence seized from Dominguez-Peraza's house was erroneously admitted against him because (1) its probative value did not outweigh its prejudicial effect under Fed.R.Evid. 403 and (2) the government failed to produce any evidence linking him to the evidence found in Dominguez-Peraza's home. We review a trial judge's decision regarding the admission or exclusion of evidence under Rule 403 for abuse of discretion. United States v. Rubio, 727 F.2d 786, 798 (9th Cir.1983).
 
 
 64
 We find the evidence seized in the house and the Mercedes-Benz properly admitted. Because Crespo was indicted for conspiracy to possess and distribute narcotics, the firearms can be relevant to show his involvement in the narcotics trade. See United States v. Martin, 599 F.2d 880, 889 (9th Cir.), cert. denied, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979) (evidence of guns seized from defendant's residence relevant to show defendant's involvement in narcotics trade). The other evidence including $6,000 in cash, a mobile phone, paging equipment, and evidence of Dominguez Peraza's cash purchases of vehicles and weapons is probative of an overall narcotics trafficking conspiracy. See United States v. Uriarte, 575 F.2d 215, 218 (9th Cir.), cert. denied, 439 U.S. 963, 99 S.Ct. 449, 58 L.Ed.2d 421 (1978), (evidence relevant to the existence and aims of the conspiracy is admissible). Moreover, the government presented sufficient evidence linking Crespo to the evidence. The record shows that the Crespo was present at the drug negotiations with Agent Coulson and had been to Dominguez-Peraza's house with Dominguez-Peraza shortly before the sale of the cocaine was to take place.
 
 C. Alleged Prosecutorial Misconduct
 
 65
 Crespo contends the district court should have granted his motion for a mistrial because the government in closing argument improperly commented on the fact that he chose not to testify. Crespo objects to the following comments by the prosecutor:
 
 
 66
 But is it possible that the kilo was on the person of Mr. Dominguez or Mr. Crespo when they were in the car; that it was moved from the van just before the Mercedes came up to the position where Mr. Coulson's car was? It was moved into it then? That it was thrown out the window during that chase, somewhere during the period when Agent Grimshaw lost sight of the vehicle?
 
 
 67
 Those things are all possible. Did they happen? Who Knows? Other than these defendants.
 
 
 68
 R.T. 758-59.
 
 
 69
 In remarking "Who knows? Other than these defendants," the prosecutor was merely bolstering the theme of his preceding comments, which stressed that defendants could easily have jettisoned one kilogram of cocaine from the car during the high-speed pursuit. The prosecutor made no reference to Crespo's failure to testify, nor did he suggest an inference of guilt could or should be drawn therefrom. Cf. United States v. Sigal, 572 F.2d 1320, 1322-23 & n. 1 (9th Cir.1978) (prosecutor erred in commenting "the defendants did not deny that Mr. Baker and Mr. Sigal were in charge of the ground portion of the conspiracy if there was such a portion"); United States v. Parker, 549 F.2d 1217, 1221 & n. 5 (9th Cir.), cert. denied, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977) (prosecutor erred in commenting on defendant's silence as follows: "Another thing is with respect to [defendant's] teeth. He very politely showed us that he had a gold cap around one of his teeth. There is one thing he failed to state, one thing he didn't tell us, is when that cap was put on.").
 
 
 70
 Without deciding whether the prosecutor's comments in this matter were proper or improper, we conclude the error, if any, was harmless beyond a reasonable doubt. We have held a prosecutor's comments on a defendant's failure to testify are harmless beyond a reasonable doubt when they are not extensive and do not stress any inference of guilt from the defendant's silence, and there is no substantial evidence that could have supported an acquittal. See United States v. Miller, 688 F.2d 652, 661 (9th Cir.1982); Sigal, 572 F.2d at 1323; Parker, 549 F.2d at 1221. Because the prosecutor's comments here satisfy these conditions, any error was harmless beyond a reasonable doubt.
 
 D. Sufficiency of the Evidence
 
 71
 Crespo claims the evidence is insufficient to support his conviction for conspiracy to possess cocaine with the intent to distribute and possession of cocaine with the intent to distribute. Evidence is sufficient to support a conviction if, when it is viewed in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. McClendon, 782 F.2d 785, 790 (9th Cir.1986). The record contains sufficient evidence to support Crespo's conviction on both counts.
 
 
 72
 The government established the existence of a conspiracy by showing that Rojas, Crespo and Dominguez-Peraza negotiated with DEA Agent Coulson for the sale of a kilogram of cocaine. Each of the defendants was present at the time and place agreed upon for the consummation of the sale. Moreover, over three kilograms of cocaine were seized from Dominguez-Peraza's house. See United States v. Ospina, 739 F.2d 448, 451 (9th Cir.1984), cert. denied, 471 U.S. 1126, 105 S.Ct. 2658, 86 L.Ed.2d 274 (1985), (both defendants present in taxicab with contraband when it was seized).
 
 
 73
 We also find sufficient evidence to support Crespo's conviction for possession under United States v. Pinkerton, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In Pinkerton, the Court declared a party to an unlawful conspiracy may be held responsible for substantive offenses committed by his co-conspirators in furtherance of the unlawful project, even if the party himself did not participate directly in the commission of the substantive offense. Id. at 646-48, 66 S.Ct. at 1183-84. The Court explained that "so long as the partnership in crime continues, the partners act for each other in carrying it forward." Id. at 646, 66 S.Ct. at 1184. Accordingly, the Court upheld the petitioner's conviction of several substantive violations of the Internal Revenue Code committed by his co-conspirator in furtherance of their conspiracy to violate the Code.
 
 
 74
 In the matter before us, there was ample evidence that a conspiracy existed and that Crespo was a party to that conspiracy. Crespo's co-conspirator possessed cocaine for the purpose of furthering the unlawful scheme to distribute the drug. Crespo, therefore, was properly held responsible for possession.PART THREE
 
 THE ROJAS APPEAL
 A. Admission of Evidence
 
 75
 Rojas contends the evidence seized from Dominguez-Peraza's house was erroneously admitted against him because it was unrelated to the crimes charged against him. As discussed above in Part Two, evidence of the cash, guns, mobile phone, paging equipment, and evidence of Dominguez-Peraza's cash purchase of vehicles and weapons was admissible as proof of the existence of a conspiracy to sell cocaine. See Martin, 599 F.2d at 889 (firearms may be relevant to show involvement in the narcotics trade); Uriarte 575 F.2d at 218 (evidence relevant to the existence and aims of the conspiracy is admissible). The district court adequately weighed the prejudicial impact of the evidence against its probative value. On ruling upon the objection to the introduction of the guns, the court stated it found the evidence was material to show the existence of a conspiracy because weapons are used to protect the monetary investment in cocaine. We have held previously that express findings are not required if it appears from the record as a whole that the judge adequately weighed the probative value and the prejudicial effect of proffered evidence. United States v. Green, 648 F.2d 587, 593 (9th Cir.1981). The district court did not abuse its discretion in admitting the challenged evidence against Rojas.
 
 
 76
 B. Sufficiency of the Evidence of Possession
 
 
 77
 Rojas also contends the district court erred by summarily denying his motion for the entry of judgment of acquittal on the charge of possession of narcotics. We review a motion for the entry of a judgment of acquittal under the same standard the district court must apply in considering such motion. United States v. Sharif, 817 F.2d 1375, 1377 (9th Cir.1987). We view the evidence in the light most favorable to the government and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id.
 
 
 78
 Contrary to Rojas' contention, the government was not required to prove constructive possession because an accused is liable for substantive crimes of his co-conspirators under Pinkerton. As discussed above, possession of the three kilograms of cocaine found in Dominguez-Peraza's house was clearly in furtherance of and within the scope of a conspiracy to sell cocaine. Pinkerton, 328 U.S. at 647, 66 S.Ct. at 1184.
 
 
 79
 C. Propriety of the Denial of the Severance Motion
 
 
 80
 Rojas argues the district court erred in denying his motion for a severance on the ground that much of the evidence presented at the joint trial was unrelated to the charges against him. We review the denial of a motion for a severance for abuse of discretion. United States v. Douglass, 780 F.2d 1472, 1478 (9th Cir.1986).
 
 
 81
 Rojas' claim that denial of a separate trial permitted the jury to hear evidence of that was not admissible against him lacks merit. The evidence introduced at trial would have been admissible against him in a separate trial to prove the conspiracy charge. Compare United States v. Donaway, 447 F.2d 940, 943 (9th Cir.1971) (overwhelming evidence pertained only to co-defendants); see also United States v. Vaccaro, 816 F.2d 443, 449 (9th Cir.1987). The district court did not abuse its discretion in denying his motion for a severance.
 
 
 82
 AFFIRMED.
 
 
 
 [1]
 Although the Holloway Court was discussing the duties of state trial courts, the Court based its ruling on the requirements of the sixth amendment. Its ruling, therefore, applies with equal force to federal trial courts
 
 
 [2]
 In United States v. Pinion, 800 F.2d 976 (9th Cir.1986) cert. denied, --- U.S. ----, 107 S.Ct. 1580, 94 L.Ed.2d 770 (1987), we stated: "Ninth Circuit cases decided since United States v. McConney, 728 F.2d 1195 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 [105 S.Ct. 101, 83 L.Ed.2d 46], (1984), have held that review of a district court determination of the voluntariness of a confession is for clear error." Id. at 980 (footnote omitted). The statement in Pinion was dictum, however, because we proceeded to rule that the confession in question was not involuntary "under either a de novo or a clear error standard." Id. at 980-81
 To support our assertion in Pinion that Ninth Circuit cases decided since McConney have applied a clear error standard of review, we cited United States v. Fouche, 776 F.2d 1398, 1404 (9th Cir.1985). In Fouche, we stated: "The finding of voluntariness is a state of mind inquiry, which is an 'essentially factual' determination. We therefore review the district court's finding for clear error." Id. at 1404 (citations omitted) (quoting McConney, 728 F.2d at 1203). To clarify our statement in Fouche, we apply a clear error standard in reviewing the district court's findings of the facts surrounding the confession, including the fact of the defendant's state of mind. However, as the Supreme Court has recently explained, "mere examination of the confessant's state of mind can never conclude the due process inquiry." Colorado v. Connelly, --- U.S. ----, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986), quoted in Wolf, 813 F.2d at 974. The district court must also consider "the constitutional acceptability of the government conduct" in evaluating the voluntariness of a confession. Wolf, 813 F.2d at 974. The district court's determination of the constitutional acceptability of the government's conduct is reviewed de novo, because, as we explained in Wolf, that determination requires the consideration of "legal concepts in the mix of fact and law" and the exercise of "judgment about the values that animate legal principles." Id. (quoting McConney, 728 F.2d at 1202).