UNITED STATES of America,
Plaintiff–Appellee,

v.

Gordon FINLAY, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

FINLAY TESTING LABORATORIES,
INC., Defendant–Appellant.

Nos. 94–10106, 94–10107.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 14, 1995.

Decided May 25, 1995.

**1412**

John J. Cleary, Cleary & Sevilla, San Diego, CA, for defendant-appellant Gordon Finlay.

M. James Lorenz, Lorenz, Alhadeff, Cannon & Rose, San Diego, CA, for defendant-appellant Finlay Testing Laboratories, Inc.

Steven S. Alm and Mark E. Recktenwald, Asst. U.S. Attys., for plaintiff-appellee U.S.

Before: FLETCHER, REINHARDT and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Gordon Finlay (Finlay) appeals his conviction of two conspiracies to defraud the United States in violation of 18 U.S.C. § 371, the first occurring between January and October of 1987 by transporting nuclear materials in violation of law and in this connection falsifying records for submission to the Nuclear Regulatory Commission (the NRC); the second, a conspiracy between August 1987 and November 1987 to defraud the United States by obtaining from the NRC a reinstatement of the license of Finlay Testing Laboratories, Inc. (FTL) to possess radioactive materials. Finlay also challenges his conviction of violating 18 U.S.C. § 1001 by making a materially false statement to the NRC.

Finlay Testing Laboratories, Inc., appeals its conviction of ten counts of illegally transporting radioactive materials in April 1987 in violation of 49 U.S.C.App. § 1809(b) and its further conviction of six counts of concealing a material fact within the jurisdiction of the NRC in violation of 18 U.S.C. § 1001.

We affirm the convictions of Finlay and of FTL.

*FACTS*

From the perspective of the government, the following was established at trial:

FTL is engaged in industrial testing by radiography, a process conducted by using portable devices known as "sources" or "cameras" which create an image of a metal object through the use of radiation. Each source contains a small pellet of nuclear material emitting gamma radiation. FTL was licensed to use such radioactive materials by the NRC and was subject to NRC regulations set out in 10 C.F.R. pt. 34 (1994); *see also* 10 C.F.R. pts. 19, 20, and 71 (1994).

Gordon Finlay was the owner and chief executive officer of FTL. In 1987 he owned 51% and his wife owned 49% of its stock. In December 1991, after commencement of the NRC investigation leading to the convictions challenged here, he transferred 2% of his stock to his wife, so that she now holds a majority interest, and he put the remaining 49% of the stock into a revocable trust of which he is both the trustee and the beneficiary.

Operating out of Oahu, FTL in 1987 had only three sources in Hawaii. The transportation of radioactive materials was prohibited on aircraft carrying passengers. 49 U.S.C.App. § 1809(b); 49 C.F.R. § 173.448(f). Compliance with the law meant that FTL had to ship its sources by barge with the result that they were tied up for a week on jobs on Hawaiian islands other than Oahu and even longer when the sources were used on a military base being constructed on Johnston Island, 700 miles from Oahu. FTL could not openly defy the law and report the breach to the NRC. FTL needed swift transport of the sources; to obtain it, FTL had to resort to deception.

In January 1987 Finlay directed the return of a source from Johnston Island to Honolulu by an employee secretly carrying the source aboard a military passenger plane. Finlay sent out a replacement source to Johnston Island as unaccompanied baggage on a civilian passenger plane. In the same month Finlay himself covertly carried a source on a passenger flight from Oahu to the Big Island of Hawaii and brought a source back in the same way. In February 1987 FTL's radiation safety officer, Tim Carroll, put a source aboard a passenger flight to the Big Island for a job at Big Island Meat Company. Two other FTL employees, at Finlay's direction, brought the undocumented source back to Oahu. In April 1987 an FTL employee made three interisland trips on passenger aircraft secretly carrying sources at Finlay's di-

rection. Also at Finlay's order they secretly carried a source to Maui and back to Oahu. On August 18, 1987, Finlay packed a container carrying a source for Ron and Randy Austin, who then carried it without documentation on a military passenger flight from Oahu to Johnston Island.

The NRC required licensees such as FTL to maintain "U-logs" to be prepared each time a source was used. FTL was also required to maintain shipping and receiving logs for the sources and to make out Hazmat forms warning shippers that they were carrying hazardous material. FTL did not prepare the U-logs or other documents that were required for any of the above-listed interisland or Johnston Island flights. For the Johnston Island job the records were further falsified to indicate that the sources were sent by barge.

In August 1987 the NRC learned of two of the illegal shipments: that to the Big Island Meat Company and that by the Austin brothers to Johnston Island. The NRC began an investigation.

Carroll admitted to the NRC that he had been involved with the source shipment to the Big Island Meat Company. Finlay and Carroll agreed that the way to placate the NRC was for Finlay to appear to suspend Carroll, and Finlay announced a one month suspension without pay in a letter to Carroll that Finlay showed to NRC investigators. Carroll continued to work and to be paid, although these facts were kept from the NRC. Despite the show of contrition, the NRC suspended FTL's license on September 21, 1987.

Two weeks later, on October 5, 1987, FTL filed a "request for recision or relaxation of order" with the NRC. The two incidents that the NRC knew of were presented by FTL as actions by employees acting without Finlay's knowledge. The violations were said not to have been authorized by FTL or Finlay "and certainly were not the usual course of business at Finlay Testing." Finlay was stated to have provided all the appropriate shipping papers, including a Hazmat form to Ron Austin for the August shipment to Johnston Island. Carroll's action was portrayed as "surprising, aberrational and un-

usual," and to have been met, when discovered, by Carroll's prompt suspension, at the end of which chastisement he would return, reformed, to the company. Attached to this request to the NRC were six false documents that Carroll had faked in April 1987 at Finlay's direction to cover up the illegal January 1987 shipments to and from Johnston Island. These documents were submitted as evidence that the proper papers had been prepared for the later Austin shipment. The bluff was clumsy since the documents on their face were dated January 9, 1987; apparently Finlay thought the fact that Carroll's name appeared on them would be enough for them to pass muster with the NRC.

### PROCEEDINGS

By April 1992 the United States Attorney for the District of Hawaii was on the verge of procuring an indictment of FTL and Finlay. Finlay already had one lawyer, Dennis Ing, for business matters. He now sought the assistance of an experienced criminal defense lawyer, John Edmunds, who contacted the United States Attorney, Daniel Bent. Bent made it clear that the United States was willing to negotiate but only if the defendants waived the five year statute of limitations. In response to this position, FTL passed a corporate resolution, drafted by Ing, authorizing the waiver of the statute of limitations for any failure of the United States to prosecute prior to April 3, 1992. Finlay signed this waiver on behalf of FTL.

Thereafter Edmunds and the United States Attorney's Office continued their conversations. In the course of them Bent stated that the United States was ready to indict FTL and Finlay at any time. The government had already indicted Carroll, and that indictment was shown to Edmunds and to Finlay. In the face of Bent's representations, Edmunds advised Finlay that negotiations could not go on unless Finlay authorized him to waive the statute for both Finlay and FTL. Finlay so authorized Edmunds. During July and August "everyone" was going to be out of town, so that it was important that a waiver be executed that would be in effect during this period.

At the beginning of August two such waivers were executed, one on behalf of Finlay and another on behalf of FTL; the waivers provided "that the period between March 30, 1992 through September 14, 1992 shall not be considered in computing the time that has run under any statute of limitations that may apply to a criminal prosecution against" either defendant. The waivers were signed by Edmunds and not by Finlay or any other officer of FTL.

Later, on August 14, 1992, Edmunds told Finlay that he had executed the waivers. Finlay made no negative comment and did not tell Edmunds that he had acted without authorization and should so advise the United States Attorney. On September 15, however, after a meeting with the United States Attorney, Finlay informed him that Edmunds had no authority to sign. The next day Finlay and FTL were indicted.

At trial Finlay moved for acquittal on the first count of conspiracy on the ground that the statute of limitations had run on all acts prior to October 1987; that Edmunds had acted without authorization in waiving the statute; and that the October 5, 1987, act charged in Count I was simply a concealment of the main conspiracy, not indictable under *Grunewald v. United States*, 353 U.S. 391, 403–404, 77 S.Ct. 963, 973, 1 L.Ed.2d 931 (1957). The district court denied the motion after an evidentiary hearing on Edmunds' authority to sign. The district court found that Edmunds had authority. The district court further found that, in any event, the United States Attorney had justly relied on Edmunds' representation that he had authority and that Finlay was estopped from repudiating the waiver. The district court also concluded that the acts charged as occurring on October 5, 1987, were part of the main conspiracy and so not barred by *Grunewald*. The jury found Finlay and FTL guilty as already indicated.

The defendants appeal. On this appeal, they raise for the first time the identity of counsel representing Finlay and FTL. They note that Edmunds represented both defendants in preliminary negotiations and at the arraignment. At the trial both defendants were represented by Walter Horie. On this appeal they were represented by John J. Cleary, who, in his opening brief, indicated that separate counsel might appear for them. In fact, a reply brief was filed on behalf of FTL by separate counsel, M. James Lorenz; his brief adopted by reference Cleary's reply brief. Both Lorenz and Cleary argued the case orally before this court.

The defendants point to Fed.R.Crim.P. 44(c) which requires the district court, in the case of joint defendants represented by a single counsel, to hold a hearing and to take appropriate measures to assure that each defendant has proper representation "unless there is good cause to believe that no conflict of interest will arise." It is argued on this appeal that this hearing was not held, no inquiry was made as to the propriety of the representation, and the single counsel acting for both defendants was, in effect, a deprivation of the right to counsel, requiring reversal.

FTL further contends that its waiver of the statute of limitations was invalid because of the conflict of interest of Edmunds. Finlay and FTL contend that the August waivers were invalid because they did not authorize those waivers and because of Edmunds' conflict of interest.

Finlay contends that the October 1987 actions were not properly charged in the Count I conspiracy, but belong to the Count II conspiracy to obtain the renewal of FTL's license. Finlay also contends that the statement charged as false in Count XV that Carroll had been suspended for a month was not false because Finlay merely stated he "intended" to suspend Carroll. Finlay also objects to the court considering as relevant conduct for sentencing under Count II the actions charged under Count I and argues that his sentence was improperly enhanced by this inclusion. The defendants also contend that the government improperly charged them with seven separate violations of 18 U.S.C. § 1001 arising out of a single document submitted to NRC on October 5, 1987. FTL contends that failure to disclose the probation officer's recommendation as to the calculation of the fine denied FTL due process and equal protection of the law. Finally, Finlay challenges the imposition of su-

pervised release on him in connection with his conviction of pre-guideline counts.

## ANALYSIS

*One Lawyer for Two Criminal Defendants*

■■■ The Sixth Amendment imposes no affirmative duty on a trial court "to inquire into the propriety of multiple representations." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). To establish a Sixth Amendment violation, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* However, what is meant by "adversely affected" is glossed by the direction that a defendant "need not demonstrate prejudice in order to obtain relief." *Id.* at 349–350, 100 S.Ct. at 1719. His burden is less than showing actual harm; he must show actual conflict.

■■■ The defendants fail to make this showing of actual conflict of interest at trial. Each had the same interest in being exonerated. Each was defended by Horie in a way designed to achieve that end. FTL was not sacrificed for Finlay; he was not sacrificed for the company. So far as being dissatisfied with the representation by a single counsel for the two defendants, even on this appeal, no separate counsel came in until the reply brief; and separate counsel only repeated for FTL what Cleary had already said for Finlay. It would be an exercise in pedantry to hold under these circumstances that there was an actual conflict of interest necessitating two lawyers where one was enough to do a professional job.

■■■ Fed.R.Crim.P. 44(c) was not observed. We have previously held that a district court's failure to comply with Rule 44(c), without more, does not compel reversal. *United States v. Crespo de Llano*, 838 F.2d 1006, 1013 (9th Cir.1987). Because the defendants have failed to demonstrate an actual conflict, we decline to reverse on this ground. *Id.* We doubt, although we do not decide, that the district court could have properly forced Finlay and FTL to adopt separate counsel. The representation of the two defendants by Edmunds when he waived the

statute of limitations does not involve the Sixth Amendment: the representation was not in court, and no court had supervision of what Finlay for himself and as CEO of FTL decided. No objection can be taken to his decision to use a single lawyer for the purposes of exploring the government's position.

## The Count I Conspiracy

■■■ The final overt act of the Count I conspiracy, as charged in the indictment, was the submission of the request to the NRC to end the suspension. The request was filed on October 5, 1987, and so prosecution of any false statements it contained was not barred by the statute of limitations. It is argued here, as it was argued in the district court, that *Grunewald*, 353 U.S. at 403–404, 77 S.Ct. at 973, bars treating the concealment of a conspiracy as part of the conspiracy. The reason for the *Grunewald* rule is that otherwise the statute of limitations on conspiracies could be virtually eliminated by always charging a cover-up as part of the conspiracy. *Id.* at 405, 77 S.Ct. at 974. "But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objects of the conspiracy, and acts of concealment done after the central objectives have been obtained, for the purpose only of covering up after the crime." *Id.* (emphasis in original).

The main conspiracy charged in Count I of the indictment in our case was a conspiracy to defraud the United States. The submission of the false documents prepared for the Johnston Island shipments was part of the main conspiracy to defraud the United States by concealing from the NRC the violation of its rules governing shipments. The conspiracy, as charged, embraced both the illegal shipments and the illegal absence of documentation and false documentation. It was an essential part of this conspiracy to continue to mislead the NRC and for that purpose on October 5 the false documentation was submitted. As the main conspiracy continued through the commission of this overt act, prosecution was not barred by the statute of limitations. That the false documents also played a part in the second conspiracy to get

back the license does not mitigate their use to further the goal of the first conspiracy.

### The Extension of the Statute of Limitations

It is unnecessary, therefore, for us to determine whether the statute of limitations was extended by the waivers signed only by Edmunds. Our resolution of the question of the conspiracy charged in Count I renders that issue moot.

### The Falsity of the Statement Regarding Carroll

Although the letter submitted by Finlay to the NRC announced an intention, as of September 11, 1987, to suspend Carroll, at the point Finlay submitted the letter to the NRC on October 5, 1987, Finlay's submission to the NRC informed that agency that the suspension had occurred. The statement was materially false. Thus, we decline Finlay's invitation to reverse his Count XV conviction.

### The Sentencing Issues

■ Count II related to acts that occurred after the Sentencing Guidelines had come into effect. It recharges all of the actions listed in Count I. Consequently, when Finlay was convicted under Count II, he was convicted of a crime as to which the acts listed in Count I constituted relevant conduct for Guidelines purposes. The district court did not err in taking this conduct into account.

■ The charge of seven separate false statements submitted to the NRC was permissible on the basis of the precedent set by *United States v. UCO Oil Co.,* 546 F.2d 833, 838–39 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

■ FTL had no right to know the recommendation of the probation officer as to the fine. The recommendation was not a factual part of the presentence report.

The government agrees that supervised release should not be imposed on Finlay for Counts XV through XXI. However, such supervised release is already concurrently imposed on him under his conviction on

Count I. There is no need to remand for resentencing.

**AFFIRMED.**