**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee*,

v.

SYLVIA OGBENYEANU WALTER-EZE,
AKA Sylvia O Okam,
        *Defendant-Appellant.*

No. 15-50315

D.C. No.
14-CR-00259-
RGK-1

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted February 7, 2017
Pasadena, California

Filed August 25, 2017

Before: Sidney R. Thomas, Chief Judge, Jacqueline H.
Nguyen, Circuit Judge, and Carol Bagley Amon,[*]
District Judge.

Opinion by Judge Amon;
Concurrence by Judge Nguyen

---

[*] The Honorable Carol Bagley Amon, United States District Judge for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a jury conviction and sentence for health care fraud and conspiracy.

The panel held that the defendant was not denied effective assistance of counsel when her attorney obtained only a short continuance of trial and declined the district court's offer of a longer continuance conditioned on counsel's paying the costs incurred by the continuance, including witness and jury fees. The panel held that both the threat of fees and the risk of a bar investigation and sanctions as a result of the fees created an actual conflict of interest that adversely affected counsel's performance. The panel assumed without deciding that the rule of *Cuyler v. Sullivan*, 446 U.S. 335 (1980), regarding a presumption of prejudice upon a showing of an actual conflict, can extend to a case of pecuniary conflict. Under the circumstances of this case, however, *Sullivan* did not control because the actual conflict was relegated to a single moment of the representation and resulted in a single identifiable decision that adversely affected the defendant, rather than tainting every interaction with or decision made by counsel. The defendant therefore was required to demonstrate that she was prejudiced by her counsel's failure to obtain the longer continuance. The defendant did not make this showing, and thus failed to establish a Sixth Amendment violation.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not abuse its discretion in ruling on the defendant's morning-of-trial request for a fifth continuance.

The panel held that the district court did not abuse its discretion in giving a deliberate ignorance jury instruction. Even though the government's case-in-chief relied primarily on the claim that the defendant had actual knowledge of the health care fraud, the jury instruction had foundation in the evidence. The timing of the instruction, after the defense had already made its summation but before the government's rebuttal, did not deprive the defendant of the right to fully defend herself.

The panel held that the district court did not plainly err in its oral recitation of a jury instruction on the elements of health care fraud. The jury instructions as a whole properly conveyed the government's burden of proof.

The panel held that at sentencing, the district court did not err in calculating the amount of loss based on the total amount billed to Medicare and Medi-Cal. The district court did not plainly err in applying an enhancement for the defendant's leadership role in a criminal activity involving five or more people. The district court also did not plainly err in calculating the amount of restitution.

Concurring only in the judgment, Judge Nguyen joined fully in the majority's conclusions. She wrote separately because she feared that the majority's reasoning regarding conflicts of interests could create confusion in the court's case law. Judge Nguyen would hold that there was no "actual conflict" that adversely affected counsel's performance, and thus *Sullivan*'s presumed prejudice rule did not apply. Like

the majority, she would apply the prejudice standard and hold that the defendant could not show prejudice due to the overwhelming evidence against her.

## COUNSEL

David J. Bernstein (argued), Law Office of David Jay Bernstein PA, Deerfield Beach, Florida, for Defendant-Appellant.

Ellen R. Meltzer (argued), Special Counsel; Joanna K.W. Bowman, Alexander F. Porter, and Blanca Quintero, Assistant United States Attorneys; Sung-Hee Suh, Deputy Assistant Attorney General; Leslie R. Caldwell, Assistant Attorney General; Fraud Section, Criminal Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

## OPINION

AMON, District Judge:

Appellant Sylvia Walter-Eze stands convicted after a jury trial of one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 1); four counts of health care fraud in violation of 18 U.S.C. § 1347 (Counts 2, 3, 5, and 6); and one count of conspiracy to pay and receive health care kickbacks in violation of 18 U.S.C. § 371 (Count 7). She was acquitted of one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1347 (Count 4). Walter-Eze was sentenced to 97 months imprisonment and

three years of supervised release and was ordered to pay restitution of $1,939,529.27.

On appeal, Walter-Eze raises challenges to her conviction and sentence on the following grounds: (1) a conflict of interest created by the district court when it conditioned an adjournment on counsel's paying jury costs and witness fees violated her Sixth Amendment right to counsel, and (2) the district court erred (a) in refusing to grant defense counsel's morning-of-trial request for a continuance; (b) in giving a deliberate ignorance instruction; (c) in instructing the jury on the burden of proof; (d) in calculating the loss under United States Sentencing Guideline ("U.S.S.G.") § 2B1.1(b)(1); (e) in applying a leadership role under U.S.S.G. § 3B1.1(a); and (f) in calculating restitution. Because we conclude that none of these claims is meritorious, we affirm.

## BACKGROUND

### I.  Pre-Trial Continuances

Walter-Eze was initially represented by a court-appointed attorney for whom the district court granted three separate trial continuances, on June 27, 2014 (continuing trial from July 1, 2014, to November 12, 2014), on November 4, 2014 (continuing trial to January 13, 2015), and on January 7, 2015 (continuing trial to March 3, 2015). In granting the last continuance, the district court found that counsel had not set forth any good cause for failing to be prepared for trial and found that counsel had not been diligent in handling the case. Nonetheless, in the interest of justice, the district court granted the third continuance, admonishing the parties that "you're going to have a really hard time" convincing the court to continue the trial any further.

After three continuances over nearly eight months and only two weeks before trial, Walter-Eze filed a motion on February 17, 2015, to substitute in Christopher Darden and Oma Nkele as counsel. On February 18, 2015, the district court held a hearing on the motion. During this hearing, the district court expressed concern that Walter-Eze's last-minute request to change attorneys was an attempt to delay trial even further. The district court therefore requested that before being substituted in, new counsel guarantee that they would be prepared to proceed on the current trial date, or at the latest, March 10, 2015. Although at first asserting that she would need another three months in order to deal with the over 21,000 pages of documents at issue, Nkele made an express commitment that she and the firm of Christopher Darden would be prepared to try the case no later than March 10, 2015. On this representation, the district court allowed the substitution, retained the existing trial date of March 3, 2015, and instructed counsel to let it know if they needed the extra week until March 10, 2015. On February 25, 2015, Walter-Eze filed a Motion to Continue Trial and the district court continued trial to March 10, 2015.

## II. Conflict of Interest

On the morning of the first day of trial, March 10, 2015, Walter-Eze filed an Emergency Motion to Continue Trial. Appearing in court, defense counsel requested a continuance from March 10, 2015, to April 7, 2015, due to Nkele's inability to prepare for trial as a result of an illness and alleged problems with the discovery materials. The district court reminded counsel of their prior representation that they would be prepared to try the case on March 10. The district court also expressed suspicion that Walter-Eze had used the substitution of counsel and other events in the preceding

month as a delaying tactic, knowing that this was the only way it would agree to another continuance. Based on the events that had transpired, the district court found that defense counsel had made misrepresentations to the court.

The district court nonetheless cautioned counsel that if they were unprepared, it was their duty to not proceed and trial would be continued to April 28, 2015, conditioned on counsel's paying the costs incurred by the continuance, including witness and jury fees, which totaled approximately $3,600. Alternatively, the district court stated that if counsel could affirm that they could adequately represent their client, trial would commence that day and no fees would be assessed. Darden expressed his concern that the proposed fees might require reporting to the California State Bar Association.[1] The district judge replied that, because he understood the reporting rule to only apply to sanctions, he would characterize the costs as fees if that would help avoid the issue. Recognizing the difficult position that counsel was in, the district court instructed counsel to discuss the matter before making their decision. After further discussion—and an initial statement that counsel were not prepared to try the case—Darden stated that he would be prepared to proceed but proposed that the district court empanel the jury that day (March 10), and then continue trial for two days. During the two days, Darden stated that he would familiarize himself with Nkele's portion of the case in the event she became unavailable due to physical limitations. Based on Darden's representation that he would be prepared to proceed on March

---

[1] California law requires an attorney to report to the Bar Association "[t]he imposition of judicial sanctions against the attorney, except for . . . monetary sanctions of less than one thousand dollars." Cal. Bus. & Prof. Code § 6068(o)(3).

12, 2015, the district court granted the fifth continuance of trial to March 12, 2015.

## III.    Evidence at Trial

At trial, witnesses called by the government testified to a five-year scheme run by Walter-Eze through her company Ezcor-9000 ("Ezcor") to fraudulently bill Medicare and Medi-Cal for durable medical equipment ("DME") provided to patients who had no need for the devices.[2]  Recruiters would be paid kickbacks to find patients and doctors would be paid for prescriptions.  Among the witnesses called were Wilmer Guzman and Elder Aguilar, workers for Walter-Eze, who explained the illegal kickback scheme and the provision of the DME; Dr. Edna Calaustro, who was paid by Ezcor to write prescriptions for unnecessary devices; and several beneficiaries (or their relatives) whose receipt of unnecessary devices served as the predicates for each of the substantive claims in Counts 2 through 6 of the indictment.  The federal and state investigators who worked on the Ezcor case also testified.

Walter-Eze testified in her own defense.  No other witnesses were called by the defense.

The majority of the government's evidence at trial pertained to one type of DME in particular—power wheelchairs—for which Medicare paid a particularly high rate of reimbursement and which, in order to be prescribed, required doctors to determine that their patients had such

---

[2] Medi-Cal is California's Medicaid program serving low-income individuals, which will reimburse the DME supplier up to 20 percent of the maximum allowable amount after Medicare pays.

limited mobility that they lacked the ability to perform activities of daily living in the home. Over 50% of the $3,432,776 of claims that Walter-Eze submitted to Medicare and Medi-Cal through Ezcor were for these high-value power wheelchairs and wheelchair accessories. The fraudulent claims were not limited to these items, but included additional DME, such as hospital beds and knee and back braces, which accounted for an additional 33% of Ezcor's business. Walter-Eze would pay recruiters such as Guzman kickbacks for each prescription that they brought in to Ezcor; the kickback amount would vary based on the reimbursement value of the piece of DME. Accordingly, the highest kickbacks were paid for power wheelchair prescriptions, followed by hospital beds, and knee and back braces. From January 2007 through early March 2012, Ezcor submitted $3,432,776 in reimbursement claims to Medicare and was paid $1,866,261. During this same period, Ezcor submitted claims to Medi-Cal totaling $89,011 and was paid $73,269.

Walter-Eze denied that she paid kickbacks to recruiters, instead characterizing them as commissions paid to independent contractors. She also denied paying any money to Dr. Calaustro for prescriptions.

## IV. Jury Instructions

During the charging conference, the government requested a deliberate ignorance instruction based on Guzman's testimony that he told Walter-Eze that Medicare beneficiaries were only accepting the power wheelchairs because Guzman was offering them money, to which Guzman said Walter-Eze replied "I don't care. Just do what you have to do." The district court replied that, "if that's what she said, that's part of the conspiracy," and thus refused

to give that instruction. Based on this ruling, the government's summation focused on Walter-Eze's actual knowledge of the fraud, and the defense's summation centered almost entirely on the argument that Walter-Eze was a naïve businesswoman who unwittingly became involved with unsavory characters who were violating the law. After the defense completed its summation, the government renewed its request for the deliberate ignorance instruction, and the district court explained that, while it had previously believed that the instruction would not be relevant, "defendant's theory in argument makes it relevant" because "after argument, the issue as to whether or not [Walter-Eze] was simply careless is directly in front of the Court." Defense counsel argued that the instruction was not appropriate. The district court disagreed and instructed the jury regarding deliberate ignorance using Model Criminal Jury Instruction 5.7.

## V. Sentencing

The district court calculated Walter-Eze's sentencing range to be 97 to 121 months. In reaching this result, the district court found an intended loss of more than $2.5 million pursuant to U.S.S.G. § 2B1.1(b)(1) and also found that Walter-Eze was the leader of a scheme involving five or more participants pursuant to U.S.S.G. § 3B1.1(a). The district court sentenced Walter-Eze to 97 months in prison to be followed by a three-year term of supervised release, and ordered her to pay restitution of $1,939,529.27, which consisted of the $1,866,260.62 of payments Ezcor received from Medicare and the $73,268.65 it received from Medi-Cal.

## DISCUSSION

### I.   Conflict of Interest

The Sixth Amendment entitles criminal defendants to the effective assistance of counsel.  To establish that counsel's representation was constitutionally defective, a defendant must show both that counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and prejudice; namely, that there was a reasonable probability that but-for counsel's unprofessional errors, the result of the proceedings would have been different.  *See Strickland v. Washington*, 466 U.S. 668, 688–94 (1984).  An exception to this general rule applies where "counsel is burdened by an actual conflict of interest."  *Id.* at 692.  In such cases, where it is often "difficult to measure the precise effect on the defense of representation corrupted by conflicting interests," the Supreme Court has held that prejudice is presumed.  *Id.*

Walter-Eze argues that the district court created a conflict between her and her counsel Darden by offering Darden the alternative of obtaining a requested continuance but paying fees and potentially facing some form of reprimand from the state bar or forgoing the continuance and avoiding the fees and possible sanctions.  She asserts that a continuance would have been in her interest but was against Darden's personal interests, and thus amounted to a conflict.  Because counsel declined the continuance and began trial without having reviewed all the discovery, subpoenaed or spoken with potential defense witnesses, or prepared jury instructions, she claims her defense was compromised.  She argues that *Cuyler v. Sullivan*, 446 U.S. 335 (1980), dictates that this Court presume that she was prejudiced by the "actual conflict," and must therefore vacate her conviction.

This case thus requires this Court to decide whether, after the Supreme Court's decision in *Mickens v. Taylor*, 535 U.S. 162 (2002), *Sullivan*—which set out the conditions under which a court should presume prejudice upon a showing of an actual conflict—applies to the circumstances of this case. Assuming without deciding that *Sullivan*'s rule of presumed prejudice as a matter of law can extend to a case of a pecuniary conflict, we hold that under the facts presented, *Sullivan* does not control this case. Accordingly, under the traditional analysis dictated by *Strickland*, Walter-Eze must demonstrate that she was prejudiced by her counsel's failure to obtain the longer continuance which, on this record, she has failed to do.

### 1.  Actual Conflict

"A claim that trial counsel had a conflict of interest with the defendant is a mixed question of law and fact and is reviewed de novo by the appellate court." *United States v. Nickerson*, 556 F.3d 1014, 1018 (9th Cir. 2009). In *Sullivan*, a case where the alleged conflict of interest was based on counsel's joint representation of multiple co-defendants, the Supreme Court found that if a defendant can show that his counsel operated under an "actual conflict of interest adversely affect[ing] his lawyer's performance"—i.e. that counsel "actively represented conflicting interests"—the client need not demonstrate that he was prejudiced by the attorney's conflict. 446 U.S. at 350.

"An actual conflict need not be a direct conflict, and it need not be established separately from adverse effect. Instead, an actual conflict 'is a conflict of interest that adversely affects counsel's performance.'" *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006) (quoting *Mickens*, 535 U.S.

at 172 n.5) (internal citation omitted). "There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action." *Sullivan*, 446 U.S. at 356 n.3. In other words, an "actual conflict" is "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens*, 535 U.S. at 171. The inquiry is accordingly fact specific and does not rely on the characterization or type of conflict presented: an "actual conflict is defined by its impact" on counsel's representation. *Hovey*, 458 F.3d at 908.

To establish an "adverse effect" a defendant must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (quoting *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir. 1996)); *see also McClure v. Thompson*, 323 F.3d 1233, 1248 (9th Cir. 2003) (noting that to establish an adverse effect, a defendant "must demonstrate that his attorney made a choice between possible alternative courses of action that impermissibly favored an interest in competition with those of the client").

A showing of "adverse effect" is not the same as showing prejudice under the *Strickland* analysis. *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992). As this Court has explained, "overwhelming evidence of guilt might . . . make almost impossible a showing that a relatively minor error resulted in actual prejudice. But such evidence would be completely irrelevant to an inquiry whether the same error, if caused by an actual conflict of interest, showed an adverse

effect on counsel's performance." *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980). Accordingly, "[t]he strength of the prosecution's case is not relevant to whether counsel's performance was adversely affected." *United States v. Mett*, 65 F.3d 1531, 1535 (9th Cir. 1995). Rather, "[t]o establish that a conflict of interest adversely affected counsel's performance, the defendant need only show that *some effect* on counsel's handling of *particular aspects* of the trial was '*likely*.'" *Miskinis*, 966 F.2d at 1268 (emphasis added); *see also Lockhart v. Terhune*, 250 F.3d 1223, 1231 (9th Cir. 2001) (clarifying that to show an adverse effect, a defendant need "only to meet the lower standard of showing that 'the attorney's behavior seems to have been influenced' by the conflict" (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir. 1994))). That is to say, a defendant need not "show[] actual harm," but just "actual conflict." *United States v. Finlay*, 55 F.3d 1410, 1415 (9th Cir. 1995).

When faced with a defendant's claim that her counsel operated under an actual conflict, "[t]he central question that we consider in assessing a conflict's adverse effect is 'what the advocate [found] himself compelled to refrain from doing' because of the conflict." *Lockhart*, 250 F.3d at 1231 (alteration in original) (quoting *United States v. Allen*, 831 F.2d 1487, 1497 (9th Cir. 1987)) (internal quotation marks omitted). This and other circuits have found that a conflict has adversely affected counsel's representation in cases where, as a likely result of the conflict, counsel failed to put on certain defenses and witnesses, *Miskinis*, 966 F.2d at 1268, failed to explore the possibility of a plea agreement, *Mannhalt v. Reed*, 847 F.2d 576, 582–83 (9th Cir. 1988), or failed to seek a continuance despite having taken the case only eight days earlier, *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1315 (7th Cir. 1986).

There are two bases for finding a conflict here: the imposition of the fees themselves, and the risk of a bar investigation and sanctions as a result of the fees. Without deciding whether such conflicts can amount to an "actual conflict" for the purposes of *Sullivan*'s presumption of prejudice, we hold that under the circumstances present here, both the threat of fees and the threat of potential sanctions created a conflict of interest that adversely affected counsel's performance.

## 2. Pecuniary Conflict

As this Circuit has made clear, the mere fact that counsel has a profit motive in a representation is insufficient to show that counsel's interests came in direct conflict with those of the client. "Lawyers almost always undertake representation of clients because of their desire to profit from the representation . . . . The fact that an attorney undertakes the representation of a client because of a desire to profit does not by itself create [a] direct 'actual' conflict of interest." *Bonin v. Calderon*, 59 F.3d 815, 826 (9th Cir. 1995). Similarly, the fact that in a pro bono case a lawyer may have to pay expert witness fees does not without more raise a conflict of constitutional dimension when such witnesses are not retained. *Williams v. Calderon*, 52 F.3d 1465, 1473 (9th Cir. 1995). If differences and commonplace disagreements between client and counsel over costs amounted to "actual conflicts" under *Sullivan*, "the rule would become hopelessly unworkable. As human beings, attorneys always have interests of their own independent of those of their clients." *Bonin*, 59 F.3d at 827. Thus, courts have held that as a general matter, there is a "presumption that the lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his clients in the matter at

hand." *United States v. Jeffers*, 520 F.2d 1256, 1265 (7th Cir. 1975).

This Court has nonetheless recognized instances wherein an attorney's financial interests do result in a conflict with their client's interests at trial. Although ultimately finding that no conflict existed, we noted in *Bonin* that an "actual" conflict does arise where circumstances "squarely place[] the interests of the client in opposition to those of the attorney, and [are] likely to compromise a reasonable attorney's ability to comply with his legal and ethical obligation to represent his client with undivided loyalty." 59 F.3d at 827; *see also Hearst*, 638 F.2d at 1193 (remanding for a hearing where defendant claimed that her counsel had a conflict of interest because his publication rights to her story led him to, among other things, fail to seek a continuance). That is, the presumption of ethical behavior that we afford to attorneys must necessarily fade where, as it is argued here, counsel explicitly favors his own pecuniary interests above his client's interests.

### 3.  Threat of Sanctions Conflict

As a general matter, the threat of sanctions can influence an attorney's conduct at trial; indeed, that is often their express purpose. *See, e.g.*, *In re DeVille*, 361 F.3d 539, 553 (9th Cir. 2004) (describing the purpose of sanctions as "to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons" (quoting Fed. R. Civ. P. 11 Advisory Committee's Note to 1993 amendment)).

Although this Court has recognized the potential power of sanctions, it is not the case that a court necessarily creates a

conflict of interest between an attorney and their client any time the court issues or threatens to issue sanctions.  In most cases, a court's imposition of sanctions can often help to better align the interests of a deficient attorney with those of their client by incentivizing counsel to handle the case with greater care.  Nonetheless, *Mickens*' directive that "an actual conflict is defined by its effect on counsel" requires courts to consider "the impact the conflict had on [counsel's] performance."  *Alberni v. McDaniel*, 458 F.3d 860, 871 (9th Cir. 2006).  The existence of a conflict must therefore be determined on a case-by-case basis, and where a threat of sanctions would instead serve to divorce counsel's interests from those of their client, an actual conflict would exist.

### 4.  Darden's Conflict

In this case, the conflict was concretely manifest in real time, as Darden was called upon to choose between being fined and potentially facing a bar investigation or going to trial even though he and his co-counsel repeatedly indicated on the record that they were unprepared.  For this reason, the government is wrong to assert that Darden was faced with only a "possible" conflict.  In fact, the existence and impact of the conflict could not have been clearer.

Even ignoring Darden's vague protest that he was "conflicted" by the choice being put to him, he made plain to the district court that his decision was influenced by the pressures imposed by the fees and potential sanctions:  "If I were forced to try the case, then I would try the case.  If I were—if it came down to sanctions or try the case, I would try the case."  Darden thus perceived the district court's proffered alternatives not so much as affording him a choice, but "compelling" him to try the case before he was fully

prepared, rather than face the district court's stiff fines. Nor was this dilemma unapparent to the district court. Immediately after indicating that he would impose fees if counsel insisted on a continuance, the trial judge offered counsel time to consider his decision, noting that, "I appreciate and I feel sorry for the bind that you're in here," and that "it's a tough, tough area that you're in right now and a tough decision that you have to make." And after hearing for the first time that obtaining a continuance for his client would require him to incur fines, Darden protested that this could require him to report to the state bar, adding that he has "worked awfully hard, and my family . . . ." Finally, while acknowledging that he had the responsibility to "protect [his] client's rights," he complained that to subordinate his own interests to those of his client's in this case was "a sharp sword to fall on."

Ultimately, this led Darden to arrive at the compromise that the district court accepted: that the district court would choose the jury that day (Tuesday) and then continue the trial until Thursday afternoon, to afford Darden the opportunity to "catch up on the other part of the case that I'm not familiar with and be prepared to go forward." Therefore, unlike in *Bonin* or *Williams*, where the Court found an undifferentiated and abstract interest in saving money insufficient to create an "actual" conflict, this case exhibits a definite and precisely articulated conflict that even according to the district court created a divergence between counsel's and Walter-Eze's interests.

As a result of the conflict, Darden's representation of Walter-Eze was adversely affected. Not only did the conflict lead Darden to forgo the plausible alternative tactic of accepting the district court's offer of a longer continuance,

but Walter-Eze alleges that as a result of the failure to obtain the lengthier continuance, counsel proceeded to trial without having subpoenaed defense witnesses or having fully engaged with the discovery materials.  To establish that Darden's conflict was "adverse," Walter-Eze need not show that these shortcomings affected the outcome of the trial or even that counsel would have cured these failures if given more time, but only that they were the *likely* result of the conflict.  *See Miskinis*, 966 F.2d at 1268; *Finlay*, 55 F.3d at 1415.  She has adequately done so.

Moreover, the facts here indicate that counsel was very concerned about the risk of bar reporting associated with the district court's imposition of costs, regardless of the how the district court described them.  It was counsel who first raised the issue of reporting.  Recognizing the legitimacy of the concern and its impact on counsel's decision whether to seek a continuance, the district court suggested that counsel utilize a brief recess to determine whether the fees would be reportable, and to make his decision based on whatever he learned.  Contrary to the government's contention, the fact that the negative effect on the lawyer is only a possibility does not make the conflict that arises out of counsel's apprehension of that risk merely "potential."

The D.C. Circuit has held that an attorney-client conflict existed where appellate counsel was being sued for defamation by trial counsel for arguing on appeal that trial counsel was ineffective.  This led appellate counsel to fear that in his continued representation of the appellant on remand to the district court, he would argue trial counsel's errors less vigorously in order to protect himself against additional defamation claims.  *United States v. Hurt*, 543 F.2d 162, 166–67 (D.C. Cir. 1976).  The D.C. Circuit determined

that, although the defamation suit was almost surely meritless, appellate counsel was sincerely concerned about the potential consequences. Finding that, in the mind of counsel, "[t]he chance that the suit might be lost, though small, had not abated" and that "[t]he stakes, measured by the gravity of defamation of professional character, were high," the court held that "however counsel's apprehensions might appear to a disinterested observer, the record indulges only the conclusion that to counsel they were very real." *Id.*

The record in this case likewise demonstrates counsel's sincere concern regarding the potential of disciplinary consequences affecting his professional reputation. That sanctions might not be imposed did not mitigate the validity and urgency of counsel's contemporaneous concerns. To the extent that a desire to avoid either the ultimate consequence or the headache associated with determining and limiting the extent of his exposure affected counsel's decision-making with regard to seeking the continuance, such considerations self-evidently suffice to establish an "actual conflict" under this Circuit's precedent.

Because the district court's ultimatum "squarely place[d]" Darden's interests "in opposition" to Walter-Eze's and explicitly "compromise[d Darden's] ability to comply with his legal and ethical obligation to represent his client with undivided loyalty," it created an "actual" conflict. *Bonin*, 59 F.3d at 827. This Court must therefore decide whether, after *Mickens* and in light *Sullivan*'s reasoning, we should presume prejudice requiring that Walter-Eze's conviction be vacated, or instead require that Walter-Eze establish that there is a "reasonable probability that, but for" this conflict, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As is discussed below, under the

facts of this case, Walter-Eze must show that she was prejudiced by this actual conflict, and because she is unable to do so, we do not disturb the verdict.

### 5. *Sullivan* and Presumed Prejudice

In *Mickens*, the Supreme Court called into question the application of a presumed prejudice rule to conflicts other than those caused by the joint representation of two or more defendants.  535 U.S. at 174–75; *see also Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) (explaining that the *Mickens* Court "cautioned that its own conflict jurisprudence had not yet reached beyond joint representation").   The *Mickens* Court noted that lower courts had applied Sullivan's presumed prejudice rule "unblinkingly to all kinds of alleged attorney ethical conflicts," "even" including alleged conflicts involving counsel's "personal or financial interests." *Mickens*, 535 U.S. at 174 (citations and internal quotation marks omitted).   The Mickens Court emphasized that Sullivan required a showing that "counsel actively represented conflicting interests," which did not support the expansive application to other sorts of conflicts or ethical violations, such as conflicts between a client's welfare and counsel's financial interests.  *Id.* at 175–76.

Accordingly, this Circuit has noted that *Mickens* "explicitly concluded that [*Sullivan*'s presumption of prejudice] was limited to joint representation, and that any extension of *Sullivan* outside of the joint representation at trial context remained, 'as far as the jurisprudence of [the Supreme Court was] concerned, an open question.'" *Foote v. Del Papa*, 492 F.3d 1026, 1030 (9th Cir. 2007) (quoting *Earp*, 431 F.3d at 1184).

In *Mickens*, the Supreme Court explained that the presumed prejudice rule was needed in situations of multiple representations because of "the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice," but that "[n]ot all attorney conflicts present comparable difficulties." 535 U.S. at 175. In the multiple representation context, "[o]nce an actual conflict has been demonstrated, prejudice is presumed since the harm may not consist solely of what counsel does, but of 'what the advocate finds himself compelled to *refrain* from doing, not only at trial but also' during pretrial proceedings and preparation." *Sanders*, 21 F.3d at 1452 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978)); *see also Mickens*, 535 U.S. at 168 ("The presumption [of prejudice is] justified because joint representation of conflicting interests is inherently suspect, and because counsel's conflicting obligations to multiple defendants . . . make it difficult to measure the precise harm arising from counsel's errors."); *Strickland*, 466 U.S. at 692 ("[I]t is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.").

As the Supreme Court explained in *Holloway*, when discussing the dangers inherent in cases of conflicting joint representation:

> [T]o assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

435 U.S. at 491. In other words, where counsel represents clients with conflicting interests throughout the trial, it is impossible to pinpoint at what point or to what extent counsel's performance on behalf of one client was impaired, and consequently impossible to determine what impact such elusive defects had on the outcome of the trial. In such a case, a court faced with an actual conflict has no recourse but to assume that the defendant was prejudiced by counsel's dual representation.

In this case, however, "we do know *precisely* the impact of any conflict on the trial," *Bergman v. Witek*, 99 F. App'x 773, 775 (9th Cir. 2004) (Berzon, J., concurring) (memorandum). It was Darden's decision to forgo the extra preparation that he could have been afforded by virtue of a longer continuance in order to avoid the monetary penalties and the risk of bar sanctions. Thus, even if *Sullivan*'s presumption of prejudice can extend, as a matter of law, beyond the case of multiple concurrent representations to the type of circumstances implicating counsel's financial interests as are faced here, this is not a case where the presumption applies. This case does not present an example of a situation—present in the case of a joint representation— where every interaction with or decision made by counsel is tainted by the conflict. Rather, where, as here, the actual conflict is relegated to a single moment of the representation and resulted in a single identifiable decision that adversely affected the defendant, the Supreme Court's reasoning regarding when prejudice should be presumed does not control. *See id.*

As the Supreme Court clarified in *Mickens*, the presumed prejudice rule was not intended "to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations

where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." 535 U.S. at 176. It follows that where a case is sufficiently straightforward such that it can be resolved under *Strickland*'s familiar performance-and-prejudice framework, *Sullivan*'s rule of presumed prejudice does not apply. *Strickland* articulates the standard normally employed when assessing potential Sixth Amendment violations, and it directs courts to require the defendant to demonstrate how there is a reasonable probability that, but for this discrete adverse act, "the result of the proceeding would have been different." 466 U.S. at 694. Accordingly, although Darden operated under an actual conflict, Walter-Eze must nonetheless show that Darden's "defects in assistance [had a] probable effect upon the trial's outcome." *Mickens*, 535 U.S. at 166.

### 6. Prejudice

Walter-Eze cannot, on this record, carry her burden to show that she was prejudiced by Darden's actual conflict. *United States v. Petersen*, 777 F.2d 482, 484 (9th Cir. 1985) (per curium) (recognizing that defendants carry the burden of showing prejudice). She lists a litany of errors supposedly resulting from Darden's unpreparedness: his failure to review all of the government's exhibits; his failure to prepare jury instructions; his failure to complete a PowerPoint presentation, resulting in the district court refusing to allow it to be shown; his failure to secure the attendance of witnesses at trial; and his failure to provide the government with a timely list of witnesses and experts. However, with this catalogue of errors, Walter-Eze has merely identified a number of alleged deficiencies in counsel's representation; she has not identified the prejudice that resulted therefrom.

As the Supreme Court has reiterated, "[e]ven if a defendant shows that particular errors of counsel were unreasonable . . . the defendant must show that they actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693. Walter-Eze has not even attempted to do so.

For instance, Walter-Eze has not provided any indication of what her "witnesses would have testified to, or how their testimony might have changed the outcome" of the trial. *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987). Nor has she indicated the detrimental effect, if any, of counsel's alleged failure to review all the exhibits or to submit jury instructions. Regarding the exclusion of the PowerPoint presentation, the record reflects that the presentation was being prepared during trial for the purposes of counsel's closing argument, and it was excluded because counsel failed to provide the final copy of the presentation to the government by 10:00 p.m. on the night before the closing, as the district court had required. There is no indication that counsel's failure to disclose the presentation on time was at all related to the conflict of interest, and thus it cannot serve as an example of prejudice *resulting from* the conflict. *See Strickland*, 466 U.S. at 694 (requiring a showing that the "specified errors resulted in the required prejudice").

Where there is no showing concerning what evidence could have been adduced to alter the outcome of the proceeding, Walter-Eze cannot demonstrate the prejudice necessary to succeed on an ineffectiveness claim on direct appeal. *See Berry*, 814 F.2d at 1409.[3]

---

[3] This Court's review on direct appeal is limited to the trial record developed below. (Fed. R. App. P. 10(a) ("The following items constitute the record on appeal: (1) the original papers and exhibits filed in the

## II. Walter-Eze's Continuance Request

A district court's decision to deny a motion for a continuance is reviewed for abuse of discretion. *United States v. Nguyen*, 262 F.3d 998, 1002 (9th Cir. 2001). Walter-Eze argues that the district court abused its discretion by denying her morning-of-trial request for a continuance. The government responds that, to the contrary, the district court did not deny counsel's request because it offered (albeit with the conditions discussed above) to continue the trial for over a month and a half—until April 28—and ultimately granted the two-day continuance that Darden requested. Indeed, although Walter-Eze continues to press this challenge in her Reply Brief, the brief opens by conceding that "[i]t is true that the trial court did not deny defense counsel's continuance." Because the district court not only offered to grant the longer continuance that Walter-Eze requested (which defense counsel rejected), but also ultimately gave a shorter two-day continuance upon defense counsel's request, the district court plainly did not deny counsel's request for a continuance.

Even if this Court construes the district court's conditioned grant of the requested one-month continuance to be effectively a denial of that request, this Court would still find no abuse of discretion. The Supreme Court has reiterated that "broad discretion must be granted trial courts

district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk.")). To the extent that Walter-Eze believes she can substantiate her allegations of prejudice through additional factual development beyond the record of the trial, the procedurally proper way to do so is by collaterally raising a claim for ineffective assistance of counsel under 28 U.S.C. § 2255. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 504–06 (2003).

on matters of continuances." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). This Court has therefore held:

> When the defendant's sixth amendment right to counsel is implicated . . . a court must balance several factors to determine if the denial [of a continuance] was "fair and reasonable." Among the factors are: whether the continuance would inconvenience witnesses, the court, counsel, or the parties; whether other continuances have been granted; whether legitimate reasons exist for the delay; whether the delay is the defendant's fault; and whether a denial would prejudice the defendant.

*United States v. Studley*, 783 F.2d 934, 938 (9th Cir. 1986) (quoting *United States v. Leavitt*, 608 F.2d 1290, 1293 (9th Cir. 1979) (per curiam)). In *Studley*, the Court affirmed the denial of a continuance even though it resulted in the defendant being unrepresented at trial, because, for among other reasons, the request for a continuance had not been made in good faith and trial had already been continued several times. *Id.* at 939; *see also United States v. Garrett*, 179 F.3d 1143, 1146–47 (9th Cir. 1999) (same where record demonstrated the "patience and consideration" the district court afforded to the defendant over a one-year period and the district court stated that the motion for continuance was being made to delay trial).

Here, after four continuances over nearly nine months, Walter-Eze on the morning of trial sought a fifth continuance. This request came after the district court had expressly warned Walter-Eze and her counsel that it would only grant

her motion to substitute counsel if they represented that they would be prepared to go to trial on the date it was set. When Walter-Eze asked for another continuance on the morning of trial, the district court noted that "we have witnesses that come in again and again and again. They're getting older. There's been inconvenience, all caused by the defense." Indeed, the government had advised the district court that Dr. Calaustro had suffered a stroke and that her attorney indicated that she would not be able to medically tolerate additional travel to appear at trial at a later date. The district court also explicitly noted its suspicion that the defendant herself was to blame for the delays in the trial and that it perceived the last-minute request to substitute counsel to be a part of these "dilatory" practices. The district court further expressed its doubt about the reasonableness of this additional request, given that counsel was aware of the scope of the evidence before taking the case and had been clearly warned by the district court that it would not allow a substitution if counsel could not be prepared by the day of trial. Finally, Walter-Eze has not established that she was prejudiced by the alleged failure to grant a continuance. Although Walter-Eze cites deficiencies in counsel's performance that she asserts followed from the lack of a continuance, she has not shown that any of them affected the outcome of the trial. *See United States v. George*, 85 F.3d 1433, 1440 (9th Cir. 1996) (finding no prejudice where defendant has not "shown how a continuance would have assisted him"). This Circuit's precedent and an analysis of the *Studley* factors dictate that if the district court's actions are construed as in effect denying a continuance, it did not abuse its discretion.

## III.    Deliberate Ignorance Instruction

Walter-Eze next argues that the trial court erred when after denying the government's initial request to instruct the jury on "deliberate ignorance" and after the defense had already delivered its closing argument under the assumption that the instruction would not be given, the district court reversed itself, agreed to give the instruction, and allowed the government to argue deliberate ignorance in its rebuttal. We review the decision to give a deliberate ignorance instruction—also known as *Jewell* instruction, after *United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976) (en banc)—for abuse of discretion. *United States v. Heredia*, 483 F.3d 913, 922 (9th Cir. 2007).

Walter-Eze makes two arguments related to the district court's decision.    First, she argues that because the government's case-in-chief relied primarily on the claim that Walter-Eze had actual knowledge of the healthcare fraud, the deliberate ignorance instruction had no basis in the evidence, created the risk that the jury would convict her based simply on criminal negligence, and thus was improper.    Second, Walter-Eze contends that the timing of the district court's decision to give the instruction (after the defense had already made its summation, but before the government's rebuttal), deprived Walter-Eze of the right to fully defend herself. Neither argument has merit.

A *Jewell* instruction may be given "if the instruction is 'supported by law and has foundation in the evidence.'" *Heredia*, 483 F.3d at 922 (quoting *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002)). *Jewell*'s "core holding" was that, for the purposes of a criminal statute, an individual without "positive knowledge" can be found to have acted

"knowingly" if the individual "consciously avoided" obtaining actual knowledge. *Id.* at 918 (quoting *Jewell* 532 F.2d at 702). In deciding whether to give a *Jewell* instruction, "in addition to an actual knowledge instruction, the district court must determine whether the jury could rationally find willful blindness even though it has rejected the government's evidence of actual knowledge. If so, the court may give a *Jewell* instruction." *Id.* at 922. It follows that, if the record contains evidence to support a deliberate ignorance instruction, it does not matter that the government primarily relied upon a theory of actual knowledge. *See United States v. Ramos-Atondo*, 732 F.3d 1113, 1120 (9th Cir. 2013) ("[N]o established principle of law declares that the deliberate ignorance instruction cannot be given unless deliberate ignorance is the main thrust of the government's case-in-chief or closing argument. The law indeed is to the contrary.").

A review of the record shows that the district court acted within its sound discretion in giving a deliberate ignorance instruction. At trial, evidence was presented upon which a reasonable jury could have concluded that even if Walter-Eze did not know about the illegal kickbacks and healthcare fraud, she deliberately failed to investigate while being aware of a high probability of the fraud. Once the defense in their summation articulated their theory of the case, i.e. that Walter-Eze was caught up in other peoples' schemes and had no knowledge of the criminal conduct, the district court rightly found that the defense had made the deliberate ignorance charge relevant to the entire course of conduct.

In summation, in addressing the evidence that Dr. Calaustro was paid by Walter-Eze to write bogus prescriptions for power wheelchairs, the defense argued that

there was no evidence that Walter-Eze ever went to Northern California to watch Dr. Calaustro examine a patient, denied that she ever spoke with Dr. Calaustro, and asserted that "she didn't know" that Dr. Calaustro was "writing hundreds and hundreds and hundreds of wheelchair prescriptions for a hundred dollars each." However, Brent Person, who works for the Centers for Medicare and Medicaid Services, testified that in his experience, "most physicians go their entire careers and only prescribe one or two power wheelchairs," but that most of Ezcor's power wheelchair prescriptions came from just four physicians, each of whom were "prescribing wheelchairs in the double-digits in only a few years." Allison Davis, a Special Agent for the Department of Health and Human Services, testified that it was "unusual" and "defies common sense" to see a DME supplier in Southern California supply patients who live in Northern California.

Given the unusually high number of high-value prescriptions that came from just four doctors, one of whom, Dr. Calaustro, was located far from Ezcor's offices, a reasonable jury could find that Walter-Eze knew there was a high probability that the referrals were being obtained fraudulently but failed to investigate the matter to ascertain the truth. *See, e.g.*, *United States v. Nicholson*, 677 F.2d 706, 710–11 (9th Cir. 1982) (finding deliberate ignorance instruction proper where the defendant remained willfully ignorant of the nature of his activity after the circumstances would "have put any reasonable person on notice that there was a 'high probability' that the [conduct] was illegal").

Walter-Eze's additional contention that the instruction was inappropriate because it could have led the jury to convict based on simple negligence is unavailing. Walter-Eze does not claim that the charge itself was an incorrect

statement of the law, and the charge makes plain that negligence is not a sufficient basis for guilt. In *Heredia*, this Court unequivocally rejected the argument that "the *Jewell* instruction risks lessening the state of mind that a jury must find to something akin to recklessness or negligence." 483 F.3d at 924 ("Recklessness or negligence never comes into play, and there is little reason to suspect that juries will import these concepts, as to which they are not instructed, into their deliberations.").

Walter-Eze's second claim is that she was denied "the right to defend herself" because, in violation of Federal Rule of Criminal Procedure 30(b)'s requirement that courts "inform the parties before closing arguments how it intends to rule on the requested instructions," the district court only decided to allow the deliberate ignorance instruction after the defense had already delivered its summation. As an initial matter, the district court correctly determined that defense counsel did make arguments in his summation which made a deliberate ignorance charge relevant, by asserting that Walter-Eze did not know and had no reason to know about her co-conspirator's criminal conduct. Indeed, defense counsel explicitly argued this point at length:

> And if that person is taken to a licensed physician, and there's no indication that these doctors were not licensed, and if that person gives a true and honest medical history which is then conveyed to my client, why should she think it's fraudulent? Why should she think there's no medical necessity? Why should she be convicted of Counts 2 through 6? It is ridiculous.

It was therefore only as a result of defense counsel's argument that the district court felt it necessary to allow the government to articulate a deliberate ignorance theory. That argument invited an explanation for *why* and *how* Walter-Eze missed all the warning signs that fraud was occurring under her watch.

But even if defense counsel did not have the opportunity to directly address the instruction in his summation, Walter-Eze was not prejudiced by this limitation. "Failure to comply with [Federal Rule of Criminal Procedure] 30 is reversible error . . . only if counsel's closing argument was prejudicially affected thereby," meaning counsel "was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments." *United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993) (quoting *United States v. Gaskins*, 849 F.2d 454, 458 (9th Cir. 1988)). Walter-Eze has not indicated how her counsel's summation would have been different had he known that the deliberate ignorance standard would apply. *See United States v. Scott*, 642 F.3d 791, 798 (9th Cir. 2011) (finding no prejudice where defendant does not articulate "any way in which his closing argument would have been different if the court had provided the instructions earlier"). As noted above, defense counsel already had argued not only that Walter-Eze did not know about her co-conspirators' scheme, but also that she had *no reason* to know of it, such that she should not be found guilty even under a deliberate ignorance theory. Because the inability to make additional argument to the jury did not "prevent [ ] defense counsel from making a point essential to the defense" that he did not already make, Walter-Eze was not prejudiced and the district court did not abuse its discretion in adding the deliberate ignorance instruction. *United States v. Horton*, 921 F.2d 540,

547 (4th Cir. 1990) (alteration in original) (quoting *United States v. Sawyer*, 443 F.2d 712, 713 (D.C. Cir. 1971)).

Finally, defense counsel never asked the district court for the opportunity to respond to the added instruction, which we have previously found precludes a challenge upon appeal. *United States v. Fontenot*, 14 F.3d 1364, 1368 (9th Cir. 1994); *see also United States v. James*, 998 F.2d 74, 79 (2d Cir. 1993) ("Having failed to request additional argument and having thereby deprived [the district court] of the opportunity to correct any potential error, [defendant's] argument on appeal that Fed. R. Crim. P. 30 was violated because he was never given the chance to reargue is without merit. . . .").

## IV.    Burden of Proof Instruction

Walter-Eze next challenges the district court's oral recitation of a jury instruction. Because she did not object at trial, this Court reviews for plain error, which requires a showing that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected [defendant's] substantial rights, which in the ordinary case means it affected the outcome of the district-court proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Walls*, 784 F.3d 543, 546 (9th Cir.), *cert. denied*, 136 S. Ct. 226 (2015). "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Anderson*, 741 F.3d 938, 947 (9th Cir. 2013) (quoting *United States v. Chao Fan Xu*, 706 F.3d 965, 985 (9th Cir. 2013)).

When delivering its oral instructions on the elements of the health care fraud conspiracy charge (Count 1), the district court stated that "[i]n order for the defendant to be found guilty of this charge, the defendant must—or the government must prove each of the following elements beyond a reasonable doubt." Walter-Eze thus claims that the district court thereby incorrectly placed the burden of proof beyond a reasonable doubt upon the defendant. The argument is meritless.

When considered as a whole with the remainder of the district court's instructions and the fact that the jury was provided a copy of the correct written instructions, the oral instruction did not constitute an error that "affected substantial rights." Both before and after the misstatement, the district court read numerous other instructions to the jury that correctly articulated that the government bore the burden of proof. Here, the district court provided the jury members with proper written instructions and explicitly—both before reading the instructions, and later when the jury asked for clarification—directed the jury to reference these instructions during its deliberations. As such, the district court's slip of the tongue was unlikely to have misled the jury or affected the outcome of the proceedings. *See United States v. Soto*, 519 F.3d 927, 932 (9th Cir. 2008) (per curiam); *see also United States v. Ancheta*, 38 F.3d 1114, 1117 (9th Cir. 1994) (finding jurors not confused by district court's slip of the tongue when reading oral instructions where they were thereafter provided with proper written instructions).

## V. Guideline Range Calculation

### 1. Intended Loss

Walter-Eze next argues that the district court erred when it found based upon the total amount billed to Medicare and Medi-Cal that the scheme involved an intended loss of more than $2.5 million, adding an 18-point offense level increase to Walter-Eze's guideline calculation pursuant to section 2B1.1(b)(1) of the United States Sentencing Guidelines. Walter-Eze argues that this overestimates her intended loss because (1) she never actually expected that Medicare would pay the full value of the claims, and (2) the government failed to carry its burden to prove that *all* of Ezcor's Medicare and Medi-Cal claims were fraudulent. These arguments fail.

"A district court's factual determinations, including the amount of loss in cases of fraud, are reviewed for clear error." *United States v. Popov*, 742 F.3d 911, 914 (9th Cir. 2014). "Clear error review is 'significantly deferential' and requires us to accept the district court's findings absent a 'definite and firm conviction that a mistake has been committed.'" *Leavitt v. Arave*, 646 F.3d 605, 608 (9th Cir. 2011) (quoting *Rhoades v. Henry*, 596 F.3d 1170, 1177 (9th Cir. 2010)). A district court "need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information." *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) (citing U.S.S.G. § 2B1.1 cmt. n.3(C)). "[A]ll that is required is that the government prove the loss by a preponderance of the evidence." *United States v. Torlai*, 728 F.3d 932, 946 n.13 (9th Cir. 2013). Accordingly, in *Popov*, this Court ruled:

In health care fraud cases, the amount billed to an insurer shall constitute prima facie evidence of intended loss for sentencing purposes. If not rebutted, this evidence shall constitute sufficient evidence to establish the intended loss by a preponderance of evidence. However, the parties may introduce additional evidence to support arguments that the amount billed overestimates or understates the defendant's intent.

742 F.3d at 916.

Since *Popov* established this burden-shifting standard in the Circuit, this Court has rejected claims similar to Walter-Eze's where the defendant does not present evidence at trial or sentencing to support the assertion that the total amount billed overestimated the defendant's intent. *See United States v. Agbu*, 640 F. App'x 613, 616 (9th Cir. 2016) (memorandum); *United States v. Adebimpe*, 649 F. App'x 449, 452 (9th Cir.) (memorandum), *cert. denied*, 137 S. Ct. 317 (2016), and *cert. denied sub nom. Abad v. United States* (U.S. Dec. 12, 2016); *United States v. Rush*, No. 13-50169, 2016 WL 7228826, at *2 (9th Cir. Dec. 14, 2016) (memorandum). Thus, because Walter-Eze failed to provide any evidence that she did not intend for Medicare and Medi-Cal to reimburse her for the full $3.5 million (or, indeed, even that she intended to be reimbursed for less than 72% of her claims, which would still amount to $2.52 million), the district court did not clearly err in relying upon the total amount billed to determine intended loss.

Nor, we should add, do counsel's arguments, unsupported by any evidence at trial or sentencing, that Walter-Eze was

familiar with Medicare's reimbursement practices or that she did not expect to recoup the full billed amount suffice to rebut this presumption. The Court therefore denies Walter-Eze's request that we remand to allow her the opportunity to present the sentencing court with evidence of her knowledge of Medicare's reimbursement practices. Having already been afforded such an opportunity, and having declined to pursue it, Walter-Eze cannot now complain about this alleged sentencing error. *Cf. United States v. Visman*, 919 F.2d 1390, 1394 (9th Cir. 1990) (holding that a defendant waives the right to challenge sentence adjustments by failing to present the issue in district court).

Walter-Eze further contends that even if the total amount billed is used, the government did not carry its burden at trial to show that all of the billed claims were fraudulent and should be counted as part of the intended loss under § 2B1.1. Although the government in presenting its case focused heavily on power wheelchairs, it presented sufficient evidence regarding the remainder of Walter-Eze's business to permit the district court to make an inference that most, if not all, of Ezcor's Medicare and Medi-Cal billing was tainted by fraud.[4] *See, e.g.*, *United States v. Yi*, 704 F.3d 800, 807 (9th Cir. 2013).

Although it was the government's burden to prove intended loss, Walter-Eze did not challenge the reasonable

---

[4] The evidence at trial was not limited to power wheelchairs and their accessories. Patients who received power wheelchairs were often prescribed unneeded hospital beds and back and knee braces, which were prescribed by the same cadre of corrupt doctors. Recruiters were also paid kickbacks for these additional items. These items accounted for at least another 33% of Ezcor's business.

inferences drawn from the government's proof. Despite knowing that the Pre-Sentence Report's ("PSR") loss calculations were based upon the view that all the sales were fraudulent and being afforded an opportunity at sentencing—three months after the trial—to rebut the government's case and establish how much of Ezcor's business was legitimate and untainted by the fraud, Walter-Eze provided no evidence to counter the government's case or to further develop the record.[5] Accordingly, the district court did not clearly err in making the "reasonable estimate . . . based on the available information" that over $2.5 of the $3.5 million that Ezcor billed to Medicare and Medi-Cal was connected to the fraud. *See Zolp*, 479 F.3d at 719.[6]

## 2. Enhancement for Scheme Involving Five or More Participants

Walter-Eze also claims that the district court erred in applying a four-point Guidelines enhancement for Walter-Eze's leadership role in a criminal activity involving five or more people because the district court never made explicit findings that the scheme involved five or more people. Although Walter-Eze at sentencing denied that she was the leader of the conspiracy, she never contested the conspiracy's size; we therefore review this newly raised contention under

---

[5] While Walter-Eze argues that she was barred from introducing evidence of her legitimate business activity by virtue of the government's successful motion in limine preventing such testimony or evidence, there was nothing to prevent defendant from introducing that evidence as part of the sentencing hearing. *See* U.S.S.G. § 6A1.3(a).

[6] Because the district court did not err in determining the intended loss, the Court need not address Walter-Eze's request that a new judge be appointed for resentencing.

the plain error standard. *See United States v. Carvajal*, 905 F.2d 1292, 1296 (9th Cir. 1990).

The Sentencing Guidelines provide for an offense level enhancement of four points "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). As with other sentencing factors, the government must establish the enhancement by a preponderance of the evidence. *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996). At trial, the government proved by a preponderance of the evidence that at least five individuals participated in the healthcare fraud. Aside from Walter-Eze herself who "may be included among the participants in the criminal activity for purposes of section 3B1.1(a)," *United States v. Egge*, 223 F.3d 1128, 1134 (9th Cir. 2000), the government showed that Guzman, Dr. Calaustro, Jean Aves, and Judith Estrella all participated in the scheme. Thus, even excluding the other recruiters listed on Walter-Eze's contact sheet, the government presented sufficient evidence to support the district court's conclusion that the scheme involved at least five participants.

Nor does the district court's failure to expressly make this finding on the record necessitate a remand for resentencing. At sentencing, Walter-Eze challenged that she was a "leader" of the scheme, but she did not contest the number of participants involved; indeed she conceded that the conspiracy consisted of "a number of members." The PSR calculated that "approximately 17 other patient recruiters" were involved in the scheme, and defense counsel did not object. Accordingly, the fact that Walter-Eze's scheme involved at least five individuals was not a disputed or "controverted matter" before the district court at sentencing,

and thus did not trigger the court's responsibility to make an explicit finding on the record under Federal Rule of Criminal Procedure 32(i)(3)(B). *See United States v. Carter*, 219 F.3d 863, 866 (9th Cir. 2000) (holding that except as where required by what is now Rule 32(i)(3), "[a] finding that a defendant is eligible for a sentence enhancement ordinarily does not require specific fact-finding"). The four-point enhancement was thus warranted and not plainly erroneous.

## VI.    Restitution Calculation

Walter-Eze relatedly argues that, due to its alleged error in calculating the intended loss, the district court erred in calculating the restitution amount. Because Walter-Eze raises an objection to restitution for the first time on appeal, we review for plain error. *United States v. Van Alstyne*, 584 F.3d 803, 819 (9th Cir. 2009).

For the same reasons discussed above in addressing Walter-Eze's challenges to the loss calculation, the district court did not plainly err in determining that all of the reimbursements that Walter-Eze received from Medicare and Medi-Cal were fraudulently obtained and thus subject to restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A(a)(1) & (c)(1)(A)(ii). Walter-Eze did not object to the district court's restitution calculations either at the sentencing hearing or in her pre-sentencing briefs. Given the government's evidence at trial, the PSR, and Walter-Eze's failure at sentencing to rebut the inferences raised therefrom, the district court's finding by a preponderance of the evidence that all of Walter-Eze's claims to Medicare and Medi-Cal were fraudulent or tainted by fraud and subject to restitution was not error. The district court reasonably ordered that

Walter-Eze repay $1,866,260.62 to Medicare and $73,268.65 to Medi-Cal.

## CONCLUSION

To summarize, we hold: (1) Walter-Eze failed to establish that she was denied her Sixth Amendment right to counsel because, although she established a conflict of interest, she failed to meet the prejudice prong of *Strickland*; (2) the district court did not erroneously fail to grant a continuance; (3) the jury instructions as a whole properly conveyed the government's burden of proof; (4) it was not error to give a deliberate ignorance charge; (5) the district court properly calculated loss under U.S.S.G. § 2B1.1(b)(1); (6) the district court properly applied a leadership role enhancement pursuant to U.S.S.G. § 3B1.1(a); and (7) the district court did not err in calculating restitution based upon the entire amount of reimbursements received by the defendant from Medicare and Medi-Cal. Accordingly, we affirm.

**AFFIRMED.**

NGUYEN, Circuit Judge, concurring only in the judgment:

I join fully in the majority's conclusions. But I write separately because I fear that the majority's reasoning could create confusion in our case law.

## I.

As the majority explains, as a general matter a defendant must show "prejudice" under *Strickland v. Washington*,

466 U.S. 668, 694 (1984), to establish that counsel was constitutionally defective. There is an exception, however, when counsel is burdened by an "actual conflict of interest." *Id.* at 692. In such cases, prejudice is presumed. *See Cuyler v. Sullivan*, 446 U.S. 335 (1980). As we have said in the past, an "actual conflict" is defined as a "conflict of interest that adversely affected counsel's performance." *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992). Under our case law, the term "actual conflict" is used in this context to mean the sort of conflict that *requires* the presumption of prejudice. *See, e.g.*, *Bonin v. Calderon*, 59 F.3d 815, 826 (9th Cir. 1995); *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006) (stating that an "actual conflict is defined by its impact").

Here, the majority analyzes at length whether Walter-Eze's counsel was burdened by an "actual conflict" of interest—or simply put, one that adversely affected his performance—and answers resoundingly yes. *See e.g.* Op. at 15 ("[W]e hold that under the circumstances present here, both the threat of fees and the threat of potential sanctions created a conflict of interest that adversely affected counsel's performance."); *see also* Op. at 20 (stating the circumstances "self-evidently suffice to establish an 'actual conflict' under this Circuit's precedent"); *see also* Op. at 23 (describing the conflict as "[an] actual conflict [] relegated to a single moment of the representation and result[ing] in a single identifiable decision that adversely affected the defendant"). The majority's conclusion that Walter-Eze's counsel was burdened by an actual conflict, one that adversely affected his counsel's performance, would appear to settle the matter under our case law. As we have repeatedly held, if an actual conflict exists that adversely affected counsel's performance, we must presume prejudice.

Yet the majority goes on to hold that *after* determining that an "actual conflict" exists, it must then consider whether to apply *Sullivan* presumed prejudice or the *Strickland* standard for prejudice, ultimately deciding on the latter. This sequencing is confusing. The majority crafts a new rule without acknowledging our well-established precedent that prejudice is presumed when an "actual conflict" adversely affecting counsel's performance exists. *See, e.g.*, *Hovey*, 458 F.3d at 907–08; *Earp v. Ornoski*, 431 F.3d 1158, 1183 (9th Cir. 2005) ("In order to establish a . . . *Sullivan* exception, the defendant must demonstrate that an actual conflict of interest adversely affected his lawyer's performance" (internal quotation marks omitted)); *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (holding that if a defendant "demonstrate[s] that an actual conflict of interest adversely affected his lawyer's performance . . . prejudice is presumed," citing *Sullivan*); *United States v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003) ("prejudice is presumed if a defendant demonstrates that his counsel labored under an actual conflict of interest," citing *Sullivan* (internal quotation marks omitted)); *see also, e.g.*, *United States v. Shwayder*, 312 F.3d 1109, 1117 (9th Cir. 2002); *Bonin*, 59 F.3d at 825. Even though the majority's conclusion appears to satisfy the presumed prejudice test from *Sullivan*, the majority instead concludes that *Sullivan* does not apply. I find the majority's approach difficult to reconcile with our many cases on this subject.

## II.

Here, I would hold that there was no "actual conflict" that adversely affected counsel's performance, and thus *Sullivan*'s presumed prejudice rule does not apply. Perhaps our precedents defining the term "actual conflict" to mean only

a conflict of interest that requires a presumption of prejudice are confusing; there are certainly conflicts of interest that look "actual" in the colloquial sense that do not merit the application of *Sullivan*.  The majority's opinion, however, will only confuse further still.

As I would find no "actual conflict" under *Sullivan*, like the majority I would apply the prejudice standard from *Strickland* and hold that Walter-Eze cannot show prejudice due to the overwhelming evidence against her.  466 U.S. at 694.

I respectfully concur in the judgment.